908 F.2d 1470
 30 Fed. R. Evid. Serv. 130, 30 Fed. R. Evid.
Serv. 135,
Prod.Liab.Rep.(CCH)P 12,642
Susan HUFFMAN, Plaintiff-Appellant/Cross-Appellee,
v.
CATERPILLAR TRACTOR COMPANY, Defendant-Appellee/Cross-Appellant.
 Nos. 86-2630, 86-2658.
 United States Court of Appeals,
Tenth Circuit.
 April 18, 1990.
Rehearing and Rehearing En Banc
Denied June 12, 1990.
 
 Macon Cowles, Williams, Trine, Greenstein & Griffith, P.C., Boulder, Colo., for plaintiff-appellant/cross-appellee.
 Harry L. Hobson, Denver, Colo. (William W. Maywhort and Marcy G. Glenn, Denver, Colo., was also on the brief), for defendant-appellee/cross-appellant.
 Before HOLLOWAY, Chief Judge, McWILLIAMS and EBEL, Circuit Judges.
 HOLLOWAY, Chief Judge.
 
 
 1
 Plaintiff Susan Huffman prevailed in the district court in a product liability action against defendant Caterpillar Tractor Co. (Caterpillar) for damages arising from the death of her husband, Garry Huffman. The jury assessed $950,000 in damages. However, pursuant to Colorado's Comparative Fault statute,[1] this figure was reduced to $475,000 to reflect the jury's determination that the decedent had been 50 percent responsible for his own injuries.
 
 
 2
 In her appeal, Huffman challenges the district court's interpretation of the term "fault" as it is employed in Colorado's Comparative Fault statute. She argues, inter alia, that the court erred when it instructed the jury that under the Colorado statute, ordinary negligence constitutes "fault." She contends that under the correct interpretation of the term "fault," her damages should be $950,000 instead of the $475,000 awarded. Huffman makes the additional argument that the district court erred in awarding costs of only $3,599.37, rather than the $76,142.82 requested, consisting largely of expert witness fees.
 
 
 3
 In its cross-appeal defendant Caterpillar raises three additional issues: (1) Did the district court err when it denied Caterpillar's motion for a directed verdict, JNOV, or a new trial on the ground that plaintiff failed to establish a prima facie case of strict product liability? (2) Did the court commit reversible error by excluding relevant testimony regarding the decedent's co-workers' opinions of his lack of competence as an operator of the vehicle on which he was killed? (3) Should this court overrule its previous holding that evidence of subsequent remediation of a product defect is admissible in strict product liability actions, and reverse because of the admission of such evidence by the trial judge?
 
 
 4
 The district court's rulings on the principal issues are stated in its Opinion and Order. Huffman v. Caterpillar Tractor Co., 645 F.Supp. 909 (D.Colo.1986). We affirm.
 
 I. Facts
 
 5
 There is evidence tending to show these facts when the record is considered favorably to plaintiff. Decedent Garry Huffman was fatally injured at the Steamboat Springs, Colorado, Ski Area on July 29, 1981. At that time Mr. Huffman was employed by The Industrial Corporation (TIC), a contractor retained by the operators of the Steamboat Springs ski slopes to install snowmaking facilities.
 
 
 6
 Huffman was operating a Caterpillar Model 561D pipelayer, a model manufactured in 1977, Jefferson Tr. 1222, on a ski slope the day of the accident. The parties stipulated that the particular pipelayer Huffman was then using was manufactured in February 1981. III R. 138. The pipelayer--a large, tracked, construction vehicle which combines elements of a bulldozer and a crane--is used in the installation of snowmaking equipment to haul large sections of pipe for placement in trenches running up the side of the ski slope. An important feature of the 561D is its braking system, which combines mechanical brakes with an hydraulic boost. The hydraulic assist substantially enhances braking capacity, but only when the vehicle's engine is running. When the engine is not running, the operator must rely exclusively on the mechanical brakes.[2] Beginning in 1981 Caterpillar altered the braking system on successor models of the 561D in order to add a spring-applied emergency braking system to the hydraulically-assisted brakes with which the TIC 561D was equipped (TR 309). Spring-applied brakes automatically and immediately stop the pipelayer whenever the engine is shut off.
 
 
 7
 To perform the task assigned to the decedent, the operator of a pipelayer must pick up a section of pipe at the bottom of the ski slope, drag it up the incline, and then use the crane-like apparatus of the pipelayer to place the section in the trench running up the side of the slope so that the pipe section can be connected to the rest of the underground piping by weld. Since the sections of pipe are heavy and cumbersome, and the slope quite steep (in this case the slope of the "See Me" trail was 53% (TR 138-39)), it requires some effort and skill to maintain the balance of the load and keep the pipelayer stable on the hill. Although the decedent had worked at Steamboat for several months and had previously operated a bulldozer for the Forest Service, at the time of the accident he had only two weeks' experience on the 561D.
 
 
 8
 The accident occurred as Huffman was operating the pipelayer to adjust the position of a large length of pipe that had already been placed in the trench on the "See Me" slope by another operator. Huffman had been instructed to close the gap between the pipe just placed in the ditch and the pipe to which it would be welded (TR 104, 978-79, 987). As Huffman tried to move the pipe into place, his co-worker, assistant welder Mike Gardner, shouted words to the effect that he should adjust the counterweight mechanism on the pipelayer in order to improve the machine's stability during this operation (TR at 106). Huffman, apparently unable to hear over the noise of the vehicle (Id. at 106-107), shut off the engine,[3] and the machine began rolling down the hill (Id. at 106-108, 122-23).
 
 
 9
 As the pipelayer accelerated, Huffman was observed "stomping" on the brake pedals, but to no avail (TR 108-110). Approximately 100 feet down the hill, with the pipelayer gaining speed, Huffman rose from his seat and tried to climb off of the vehicle (Id. at 111). He became tangled in the machine's cable works and then fell on to the tracks of the vehicle. In an instant, he was crushed to death (TR 111-112, 980).
 
 II. Procedural History
 
 10
 Plaintiff initially filed this action in the state District Court for Boulder County, Colorado. Caterpillar removed the case to the United States District Court for the District of Colorado.
 
 
 11
 There, Caterpillar filed a motion in limine seeking to bar the introduction of evidence of Caterpillar's subsequent remediation in the design of the 561D. This motion was denied. During the trial, Caterpillar moved for a directed verdict at the close of the plaintiff's evidence (TR 908-910) and again at the close of all of the evidence (TR 1305-06), arguing that plaintiff had failed to establish a prima facie case of strict liability. The district court denied the motions with respect to plaintiff's defective design and failure to warn claims (TR 910-11, 1328). After the two-week trial the jury found Caterpillar liable for $475,000 in damages.
 
 
 12
 After judgment was entered for plaintiff, Caterpillar filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. In support of this motion, Caterpillar (1) renewed its argument that plaintiff had failed to establish a prima facie case of strict liability, (2) argued that the evidence was insufficient to support the verdict, and (3) claimed that the district court had made certain fundamentally erroneous and prejudicial evidentiary rulings. The motion was denied.
 
 
 13
 Plaintiff's motion to alter or amend the judgment was granted in part and denied in part. The district court increased the pre-judgment interest award to nine percent per annum, but refused to grant plaintiff's claim for the full $950,000 in assessed damages. In its second amended judgment the court awarded $475,000 in damages, interest, and costs of $3,599.37.
 
 III. Discussion
 A. Huffman's Appellate Issues
 
 14
 1. Comparative Fault: Doctrinal Development
 
 
 15
 Plaintiff's central argument on appeal is that the district court's jury instructions regarding the issue of comparative fault erroneously stated the law under Colorado's comparative fault statute, Sec. 13-21-406 C.R.S. (1980 & 1988 Supp.). Jury instruction 31, it is contended, incorrectly defined "fault," as used in the comparative fault statute, to subsume ordinary negligence. In place of the district court's interpretation, plaintiff urges a construction of the statute that would allow a jury to consider only a plaintiff's assumption of risk and/or product misuse in deciding the extent to which a judgment should be reduced after a finding of manufacturer liability. Thus plaintiff should be entitled to the full $950,000 in assessed damages; because the decedent's measure of "fault" for his fatal accident did not rise to the level of assumption of risk or misuse, there was no basis for any reduction in the damage award.
 
 
 16
 Plaintiff's argument is not without some foundation, especially when we consider the doctrinal origin of comparative fault. Over the years, a multiplicity of meanings have attached to the terms "comparative negligence" and "comparative fault." There is, however, no universally-accepted legal distinction between the two terms. Indeed, the terms "fault," and "negligence" are often used interchangeably in the context of product liability actions. See e.g., Tafoya v. Sears Roebuck and Co., 884 F.2d 1330, 1341 (10th Cir.1989); Kathios v. General Motors Corp., 862 F.2d 944, 947 (1st Cir.1988); Scott v. Rizzo, 96 N.M. 682, 634 P.2d 1234, 1240 (1981); Annotation, Applicability of Comparative Negligence Doctrine to Actions Based on Strict Liability in Tort, 9 A.L.R.4th 633, 635 (1982); D. Dobbs, R. Keaton, D. Owen, PROSSER AND KEETON ON THE LAW OF TORTS, Sec. 67, at 479 (5th ed. 1984). When a distinction is made, it is usually explained or implied that "fault" is a broader term, encompassing a wider range of culpable behavior or responsibility for injury than that covered by the term "negligence." See e.g., Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 406 A.2d 140, 145 (1979) ("We read the term "negligence" in our [comparative negligence] act as being subsumed within the concept of tortious fault"); Lippard v. Houdaille Industries, Inc., 715 S.W.2d 491, 499 (Mo.1986) (en banc ) (Donnelly, J., dissenting) (" 'Fault' includes acts or omissions that are in any measure negligent or reckless").
 
 
 17
 In some jurisdictions it has been held either through the construction of or inference from a state comparative negligence statute,[4] or by means of judicially-adopted rules,[5] that comparative negligence or comparative fault principles are applicable to strict products liability actions. Other courts by contrast, have held that such principles could not be applied to the analysis of strict products liability claims.[6] Before the adoption in 1981 of its comparative fault statute, Sec. 13-21-406 C.R.S. (1980 & 1988 Supp.), Colorado's common law clearly placed it in the latter category.[7]
 
 
 18
 The rationale for separating comparative fault or comparative negligence from products liability derives from the understanding that strict products liability analysis is not fundamentally based on a culpability or "blameworthiness" inquiry.[8] Rather, the doctrine imposes liability where a product was defective when it left the defendant manufacturer's hands, even though the manufacturer is not proven negligent in the production of the item.[9]
 
 
 19
 Viewed in this light, the doctrinal tension between strict products liability and comparative fault or comparative negligence[10] becomes clear: Strict liability reflects the effort to remove the issue of negligence or fault from product liability analysis, and to place the emphasis on causation. Comparative negligence or comparative fault rules, as applied to product liability actions, inject a culpability inquiry into the process of apportioning damages. Nevertheless, it is quite conceivable that in enacting its comparative fault statute, Sec. 13-21-406 C.R.S. (1980 & 1988 Supp.), the Colorado legislature intended to change the state's product liability law in order to establish a hybrid system, combining elements of strict liability with elements of a fault or negligence regime. Indeed, the evolution of such hybrid systems appears to have become something of a national trend: "[i]n recent years there has been widespread adoption of comparative negligence, either judicially or by statutes, either expressly adopting comparative fault in products liability cases or in statutes construed to include products liability actions." 2 L. FRUMER 7 M. FRIEDMAN, PRODUCTS LIABILITY Sec. 3.01[f] (1988).[11]
 
 2. Colorado's Comparative Fault Statute
 
 20
 We cannot agree that the trial court's construction of Colorado's comparative fault statute constitutes reversible error. From our examination of the Colorado statute, its legislative history, the relevant decisional law, and canons of statutory construction, we conclude that the trial court's instructions on the issue of comparative fault were correct.
 
 
 21
 In construing Colorado's comparative fault statute, Sec. 13-21-406 C.R.S. (1980 & 1988 Supp.), "[o]ur primary task ... is to ascertain and give effect to the intent of the [Colorado] General Assembly." People v. Guenther, 740 P.2d 971, 975 (Colo.1987) (en banc ); see also, People v. District Court, 713 P.2d 918, 921 (Colo.1986). "To discern that intent, we look first to the language of the statute itself, giving the statutory terms their commonly accepted and understood meaning." People v. Guenther, 740 P.2d 971, 975 (Colo.1987) (en banc ); see also, Colorado Common Cause v. Meyer, 758 P.2d 153, 160 (Colo.1988) (en banc ); Binkley v. People, 716 P.2d 1111, 1113-14 (Colo.1986). However, "[t]echnical terms or terms of art used in a statute are presumed to have their technical meaning." Board of Assessment Appeals v. Arlberg Club, 762 P.2d 146, 152 (Colo.1988) (en banc ), citing 2A N. Singer, Sutherland's Statutory Construction, Sec. 47.29 (Sands 4th ed. 1984 rev.).
 
 
 22
 The key passage of C.R.S. 13-21-406 reads as follows:
 
 
 23
 Comparative fault as measure of damages. (1) In any product liability action, the fault of the person suffering the harm, as well as the fault of all others who are parties to the action for causing the harm, shall be compared by the trier of fact in accordance with this section. The fault of the person suffering the harm shall not bar such person, or a party bringing an action on behalf of such a person ... from recovering damages, but the award of damages to such person or the party bringing the action shall be diminished in proportion to the amount of causal fault attributed to the person suffering the harm. * * *
 
 
 24
 Sec. 13-21-406 C.R.S. (1980 & 1988 Supp.) (emphasis added).
 
 
 25
 We note that the General Assembly provided no statutory definition of the term "fault" as it appears in C.R.S. 13-21-406. However, the comparative fault statute does direct that the provisions of Colorado's comparative negligence statute, Sec. 13-21-111 C.R.S. (1980 & 1988 Supp.), "do not apply to any product liability action." Sec. 13-21-406(4) C.R.S. (1980 & 1988 Supp.) (emphasis added). Thus, although the terms "comparative fault" and "comparative negligence" are often used interchangeably by commentators and courts, the choice of the term "fault" and the express statement that Colorado's comparative negligence statute does not apply to product liability, suggests that the Colorado legislature intended some difference between "fault" and "negligence" in this context. From the statutory language alone then, we can discern an intention to draw some distinction between "fault" and "negligence"; however, the language itself does not define the precise nature of the distinction. Nevertheless, we are impressed with the breadth of the statute's word "fault" as it is employed in common usage,[12] and with the breadth of the statute's strong language on the diminution of damages in "any product liability action."
 
 
 26
 Having considered the express language of the statute, we proceed to the legislative history for further illumination of the General Assembly's intent.[13] Section 2-4-203(1)(c) (1980 & 1988 Supp.); see also, People v. Guenther, 740 P.2d 971, 975 (Colo.1987) (en banc ). Since the legislature is presumed to be cognizant of the state of the law at the time a statute is enacted, we may also look for guidance to "[t]he common law or former statutory provisions, including laws upon the same or similar subjects...." C.R.S. Sec. 2 4 203(1)(d) (1980 & 1988 Supp.); see also, Board of Assessment Appeals v. Arlberg Club, 762 P.2d 146, 152 (Colo.1988) (en banc ), citing 2A N. Singer, Sutherland's Statutory Construction, Secs. 47.30, 50.03 (Sands 4th ed. 1984 rev.).
 
 
 27
 In light of the legislative history of C.R.S. 13-21-406, we are convinced that the construction urged by the plaintiff must be rejected.[14] At no point in the legislative deliberation on the statute can we find any indication that the General Assembly intended to enact the common law of Kinard v. Coats, 37 Colo.App. 555, 553 P.2d 835 (1976), or otherwise to restrict the definition of "fault" to assumption of risk and/or product misuse. Indeed, the intent of the legislature appears to be quite the contrary. The term "fault," as employed in C.R.S. 13-21-406, is more plausibly construed[15] as a general term encompassing a broad range of culpable behavior[16] including, but not limited to, negligence.[17]
 
 
 28
 We also note that although the General Assembly enacted neither the Uniform Comparative Fault Act, Secs. 1-6, 12 U.L.A.Supp. 35-45 (1983), nor the specific comparative fault regime of some other jurisdiction, the legislative record indicates that the Members were aware of other comparative fault regimes in which the term "fault" subsumed the term "negligence."[18] Notwithstanding this awareness of the law of other jurisdictions, the Colorado legislature took no steps to distinguish Colorado's use of the term "fault" so that it might expressly encompass a narrower range of culpable behavior than was legally cognizable under the comparative fault rules of other states.
 
 
 29
 Thus we are in agreement with the statutory interpretation made here by the district judge. Sade v. Northern Natural Gas Co., 483 F.2d 230, 236 (10th Cir.1973).[19] Given the language and history of the statute, we are persuaded that we should uphold the district judge's Instruction No. 31 on this issue and his determination that under Colorado's comparative fault statute, the plaintiff's damage award should be reduced to $475,000 on the basis of the jury's finding of 50 percent comparative fault on the part of the decedent.
 
 3. Costs
 
 30
 Plaintiff's second claim of error concerns the district court's decision to allow costs of $3,599.37, instead of the much larger amount sought. The court was asked to award costs which included (1) $1,584.40 for deposition transcript expenses, (2) $1,004.00 for expert witness time and expenses, (3) $2,644.44 in exhibit costs, and (4) $72,273.88 for expert witness fees. The differences between the amounts requested and the amounts awarded in these categories was (1) $316.88, (2) $753.00, (3) $2,581.44, and (4) $71,439.08. Plaintiff also unsuccessfully sought reimbursement for attorneys' travel costs incurred in taking depositions in Illinois. Plaintiff's motion to review taxation of costs was denied by the district court.
 
 
 31
 Plaintiff's primary argument on the costs issue is that the denial of most of the requested expert witness fees violated a Colorado statute. Sec. 13-33-102(4) C.R.S. (1980 & 1988 Supp.).[20]
 
 
 32
 This argument was addressed in Chaparral Resources, Inc. v. Monsanto Co., 849 F.2d 1286 (10th Cir.1988). "In a diversity case, federal law controls in regard to the assessment of costs." Chaparral Resources, at 1291-92, citing, Bosse v. Litton Unit Handling Systems, Division of Litton Systems, Inc., 646 F.2d 689, 695 (1st Cir.1981); Bartel, Taxation of Costs and Awards of Expenses in Federal Court, 101 F.R.D. 553, 555 (1984); 10 C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE AND PROCEDURE Sec. 2669 (1983). In conformity with Crawford Fitting v. J.T. Gibbons, Inc., 482 U.S. 437, 439, 107 S.Ct. 2494, 2496, 96 L.Ed.2d 385 (1987), we hold as a matter of federal law that unless authorized by statute or express agreement, expert witness fees are recoverable only within the federal statutory limit for other witnesses.[21] Moreover, the Colorado statute "... does not specifically authorize the assessment of expert witness fees as costs...." Chaparral Resources at 1293. Therefore, expert witness fees may only be awarded as costs at a maximum rate of $30 per witness, per day of trial testimony. Id. at 1293.
 
 
 33
 Thus the plaintiff's argument based on C.R.S. 13-33-102(4) lacks merit. Plaintiff cannot rely on the Colorado statute to authorize the payment of expert witness fees in excess of the $30 per day rate mandated by 28 U.S.C. Sec. 1821(b). Nor has the plaintiff made any showing that the district court otherwise abused its discretion on the matter of costs.
 
 B. Caterpillar's Cross-Appeal
 1. Failure to Establish Prima Facie Case
 
 34
 In its cross-appeal, Caterpillar challenges the trial court's denial of its motions for judgment notwithstanding the verdict. It claims that it was entitled to judgment on plaintiff's defective design claim because plaintiff failed to establish a prima facie case that (1) the 561D's braking system was defective and unreasonably dangerous, (2) that the defect caused the fatal accident, and (3) that Caterpillar's warnings were inadequate.
 
 
 35
 The standard in determining whether judgment n.o.v. should be granted is "not whether there is literally no evidence to support the party opposing the motion, but whether there is evidence upon which the jury could properly find a verdict for that party." Brown v. McGraw-Edison Co., 736 F.2d 609, 613 (10th Cir.1984). We cannot agree that the district court erred in denying Caterpillar's motions.
 
 
 36
 Caterpillar argues that plaintiff failed to make a prima facie case that the 561D was in a "defective condition unreasonably dangerous to the user or consumer." RESTATEMENT (SECOND) OF TORTS Sec. 402A; Union Supply Co. v. Pust, 196 Colo. 162, 583 P.2d 276, 280 (1978). Section 402A of the Restatement and Comments "g" and "i,"[22] and Colorado case law recognize the consumer expectation test as one appropriate test in design defect cases. See generally, Ortho Pharmaceutical Corp. v. Heath, 722 P.2d 410, 413 (Colo.1986). To be unreasonably dangerous the product "must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer or user." Curtis v. General Motors Corp., 649 F.2d 808, 810 (10th Cir.1981); Prosser, supra, Sec. 99, at 698-99.
 
 
 37
 Evidence marshalled by the plaintiff was more than adequate to support a jury determination that the Caterpillar 561D was unreasonably dangerous under the consumer expectation test. Plaintiff presented testimony on which the jury could have reasonably based the conclusions that (a) the placement of the brake pedals made it excessively difficult for a man of average height to brake the 561D in an emergency (TR at 529), (b) that the near impossibility of stopping the machine on an incline once it began to roll for more than 20 feet with its engine off presented an unreasonable and unexpected hazard (TR 229-30, 243), and/or (c) that the absence of the feasible spring-applied braking system created an unreasonable danger beyond the expectation of the ordinary user of the 561D.
 
 
 38
 Caterpillar's claim that plaintiff failed to establish a prima facie case that the defect[s] of the 561D caused the accident is similarly unpersuasive. Caterpillar argues that the 561D was "risk-neutral," that Huffman's operation of the machine amounted to misuse, and that Huffman's inexperience was the sole cause of the accident. However, plaintiff presented testimony that it is not uncommon for an operator to shut off his pipelayer on a slope (TR at 80). Construction machines also stall and break down on occasion, on the mountainous work-sites where they are frequently used. Viewing the record in its entirety, the jury had before it an adequate evidentiary basis for concluding that Huffman did not misuse the 561D and that the machine's defect or defects caused, or partially caused, the decedent's death.
 
 
 39
 We are also unconvinced by Caterpillar's contention that plaintiff failed to establish a prima facie case that the warnings accompanying the 561D were inadequate. Under Colorado law, "warnings or instructions for use must adequately inform the ordinary user of any specific risk of harm which may be involved in any intended or reasonable expected use or any failure to properly follow instructions when using the products for any intended or reasonably expected use." CJI-CIV.2d 14:20 (1980) (emphasis added); Hiigel v. General Motors Corp., 190 Colo. 57, 544 P.2d 983, 988 (1975). Since the record indicates that there was no formal instruction for operators of the 561D, it was foreseeable that some portion of the operators of the 561D would be inexperienced. No evidence was presented to suggest that Huffman was reckless, lacking in intelligence, or otherwise unqualified to learn the operation of the 561D. Caterpillar did expressly warn in the operator's manual that the machine should not be allowed to coast downhill (Ex. A at 29). However, Caterpillar's instructions did not explain the functioning of the hydraulic assist braking system when the engine is off.[23] Nor were there emergency instructions regarding proper procedure in the event that a 561D began to roll down an incline, a contingency that was foreseeable in the course of its reasonable and intended use even if the operator did not turn the engine off intentionally. Given these circumstances, the testimony before the jury, and the reasonable inferences therefrom, we cannot agree that Caterpillar was entitled to have the jury's verdict set aside.
 
 
 40
 2. Exclusion of Testimony of Mr. Huffman's Co-Workers
 
 
 41
 Caterpillar also makes the argument on cross-appeal that the district court's rulings refusing to admit certain testimony from the decedent's co-workers were reversible errors.
 
 
 42
 For a finding of reversible error, the contested evidentiary rulings must not only be legally erroneous; it must also be demonstrated that the exclusions affected "the substantial rights of the parties." Malandris v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 703 F.2d 1152, 1158 (10th Cir.1981), cert. denied, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). We note, moreover, that the district court's determination whether evidence is relevant will not be reversed, absent a clear abuse of discretion. Hill v. Bache Halsey Stewart Shields, Inc., 790 F.2d 817, 825 (10th Cir.1986).
 
 
 43
 The evidence excluded by the district court was testimony by several of Huffman's co-workers, expressing the concern, or relating expressions of concern from others, that the decedent may not have been competent to operate the 561D (objections sustained at TR 115-16, 119, 125-26, 975, 1007-8, 1025). The testimony was primarily excluded on the grounds that it was hearsay (relating comments by others regarding Huffman's competence) or irrelevant. Caterpillar argues that this testimony was of "critical" importance in establishing that it was Huffman's misuse, and not the machine's defect[s], which caused the accident.
 
 
 44
 We are satisfied that the trial court's hearsay determinations were sound and that the legal relevance of the material was within the trial judge's discretion. There was no abuse of discretion in the court's rulings on the relevance of these opinions on Huffman's ability to operate the 561D.
 
 
 45
 3. Admission of Evidence Pertaining to Remediation
 
 
 46
 The third major argument presented by Caterpillar's cross-appeal concerns the admissibility of evidence concerning subsequent remedial measures in strict product liability cases, under Rule 407 of the Federal Rules of Evidence. Acknowledging that in Herndon v. Seven Bar Flying Service, Inc., 716 F.2d 1322 (10th Cir.1983), cert. denied sub nom., Piper Aircraft Corp. v. Seven Bar Flying Service, Inc., 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984), this court held that Rule 407 does not apply to strict product liability cases,[24] Caterpillar asks this panel to overrule Herndon.
 
 
 47
 Our panel cannot overrule the court's prior precedent. Derstein v. Van Buren, 828 F.2d 653, 656 n. ** (10th Cir.1985); Annotation, In Banc Proceedings In Federal Courts of Appeals, 37 A.L.R.Fed. 274, 293, Sec. 5 (1978).
 
 
 48
 AFFIRMED.
 
 ORDER
 
 49
 Before HOLLOWAY, Chief Judge, McWILLIAMS, McKAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY and EBEL, Circuit Judges.
 
 
 50
 On consideration of the petition for rehearing and suggestion for rehearing en banc, the Plaintiff's Response thereto, and a Reply by Caterpillar, the panel, Judges Holloway, McWilliams and Ebel, find and conclude as follows:
 
 
 51
 The defendant-appellee argues in its petition for rehearing and suggestion for rehearing en banc that the court should reconsider en banc and overrule its opinion in Herndon v. Seven Bar Flying Service, Inc., 716 F.2d 1322 (10th Cir.1983), cert. denied sub nom. Piper Aircraft Corp. v. Seven Bar Flying Service, Inc., 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984). However, on consideration of the record, we conclude the claim of a violation of Rule 407, Federal Rules of Evidence, is not supported and no basis for reconsideration of Herndon is presented by this case. Rule 407 states in relevant part:
 
 
 52
 When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. (Emphasis added.)
 
 
 53
 FED.R.EVID. 407.
 
 
 54
 By its terms, clearly the Rule does not encompass remedial measures taken before the "event" in question. Defendant Caterpillar argues that here the relevant "event" was the manufacture of the 561D without spring-applied brakes, rather than the occurrence of the fatal injury to Huffman on the 561D which was not equipped with spring-applied brakes. Defendant-Appellee's Petition for Rehearing at 5, 11. Caterpillar cites Petree v. Victor Fluid Power, Inc., 831 F.2d 1191 (3d Cir.1987), Alabama Power Co. v. Marine Builders, Inc., 475 So.2d 168, 172 (Ala.1985), and Uptain v. Huntington Laboratory, Inc., 723 P.2d 1322, 1329 (Colo.1986), in support of their interpretation of Rule 407. We disagree.
 
 
 55
 We are convinced that it is clear from the wording and history of Rule 407 that the term "event" refers to the time of the accident or injury to the plaintiff, not to the time of manufacture of the product or creation of the hazard.[1] See 2 WEINSTEIN'S EVIDENCE at 407-2, 407-5 ("The use of the phrase 'remedial measures' is designed to bring within the Rule any post-accident repair or precaution.") (emphasis added) (footnote omitted). In the first sentence of the Rule, the plain meaning of the phrase "would have made the event less likely to occur," suggests reference to the accident or injury, not manufacture. Colorado cases suggest a similar understanding of the term "event." See, e.g., Uptain, 723 P.2d at 1328-29 (pointing to submission of a new warning label "one year prior to the date of the plaintiff's injuries"); Martinez v. W.R. Grace Co., 782 P.2d 827, 828-29 (Colo.App.1989) (inquiry focused on post-accident remediation); Vallejo v. Eldridge, 764 P.2d 417, 418 (Colo.App.1988) (same); Duggan v. Weld County Bd. of County Commissioners, 747 P.2d 6, 8-9 (Colo.App.1987) (same); Downing v. Overhead Door Co., 707 P.2d 1027, 1033 (Colo.App.1985).
 
 
 56
 Moreover, the interpretation of the word "event" in Rule 407 urged by Caterpillar is inconsistent with this court's interpretation of the plain language of the Rule. See, e.g., Rimkus v. Northwest Colorado Ski Corp., 706 F.2d 1060, 1064 (10th Cir.1983) ("[Rule 407] codified the generally accepted common law rule which excluded remedial measures which were taken after an accident ") (emphasis added).
 
 
 57
 Furthermore, we are not persuaded by the proffered analogy between the Huffman case and cases ruling on the admissibility of warning labels introduced after manufacture, but before injury. See, e.g., Petree, 831 F.2d at 1198. We do not have an issue here concerning the admission of warning labels introduced after manufacture. The gist of the complaint in the briefs and the petition for rehearing is that it was improper to introduce evidence of a technological design change adding spring-applied brakes to the Caterpillar 561D pipelayer. That design change took place no later than March 1981. Thus, the design change in question preceded the fatal accident of Huffman in July of 1981. The design change accomplished between 1978 and 1980 cannot be interpreted as "subsequent remediation" in response to an event that occurred in July 1981.
 
 
 58
 The record evidence established clearly the following circumstances. The modification in question--the addition of spring-applied brakes to Caterpillar's line of pipelayers--occurred before the fatal accident in July 1981. Caterpillar began equipping other machines in its product line with spring-applied brakes in 1971. The spring-applied brakes for the Model 561D were designed between 1978 and 1980; the 561D vehicle on which Huffman was killed was manufactured on February 20, 1981, as the parties stipulated, III R. 138; and the first 561D pipelayers equipped with spring-applied brakes were manufactured in March of 1981. The fatal accident of Huffman occurred on July 29, 1981.
 
 
 59
 This undisputed chronology establishes that the addition of spring-applied brakes to the 561D pipelayer was not a "subsequent measure" as that term is employed in Rule 407. The change in the product design occurred before the accident involving Huffman regardless of whether the remedial measure is deemed to have occurred when design work began or when the spring-applied brakes were first implemented on the 561D pipelayer.[2] Thus, the refusal to exclude evidence of Caterpillar's development of spring-applied brakes for the 561D pipelayer was not in violation of the terms or the rationale of Rule 407, FRE, or the identical Colorado Rule 407.
 
 
 60
 What we have said rejects the principal argument of Caterpillar in its petition for rehearing, namely that Rule 407, FRE, applies to this strict product liability case and that under the Rule as applied by the majority of the federal circuits, error was committed. For reasons given above, we are convinced that no valid claim of error based on violation of Rule 407, FRE, principles is before us. There is, however, another argument suggested by Caterpillar based upon its reliance on Colorado law pronounced in Uptain v. Huntington Laboratory, Inc., 723 P.2d 1322 (Colo.1986), and our decision in Moe v. Avions Marcel Dassault-Breguet Aviation, 727 F.2d 917 (10th Cir.1984); see also Wheeler v. John Deere Co., 862 F.2d 1404, 1410 (10th Cir.1988). The argument is suggested that under Colorado law principles, which Moe would adopt, there was a violation of Rule 407 principles.
 
 
 61
 Although this argument has not been urged before, we have considered the contention and find again that it is lacking because the record does not support any claim of error even on this state law theory. Uptain quite clearly holds that for a violation of Colorado Rule 407 principles to occur, the offending evidence must concern a remedial measure taken subsequent to "the plaintiff's injuries." 723 P.2d at 1328-29. Again, the theory advanced has no substance because of lack of record support. No rehearing or rehearing en banc is justified.
 
 
 62
 Accordingly, the petition for rehearing is denied by the panel. In accordance with Rule 35, Federal Rules of Appellate Procedure, the suggestion for rehearing en banc was submitted to all the active judges of the court, as well as to the panel. There being no request for a poll, the suggestion for rehearing en banc is also denied.
 
 
 63
 IT IS SO ORDERED.
 
 
 
 [1]
 Colo.Rev.Stat. Sec. 13-21-406 (1980 & Supp.1988) (Comparative Fault as Measure of Damages)
 
 
 [2]
 One of the central arguments of the plaintiff at trial was that Caterpillar should have equipped the 561D with "spring-applied" brakes. This technology, which is now standard on the successor models to the 561D and was said to have been technically feasible at the time the 561D leased by TIC was manufactured (TR. at 352), automatically stops the vehicle whenever the engine is shut off. Plaintiff contends that this technology would have saved the decedent's life, had it been integrated into the design of the 561D leased by TIC for use at Steamboat Springs
 
 
 [3]
 There is conflicting testimony regarding whether or not Huffman set the parking brake before shutting off the engine. (TR 71, 106-108)
 
 
 [4]
 See e.g., Prince v. Leesona Corp., 720 F.2d 1166 (10th Cir.1983); Mulherin v. Ingersoll-Rand Co., 628 P.2d 1301 (Utah 1981); Kennedy v. Sawyer, 228 Kan. 439, 618 P.2d 788 (1980)
 
 
 [5]
 See e.g., Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 427 (Tex.1984) ("Judicial adoption of a comparative apportionment system is a feasible and desirable means of eliminating confusion and achieving efficient loss allocation in strict liability cases. Accordingly we adopt such a system."); Scott v. Rizzo, 96 N.M. 682, 634 P.2d 1234, 1241 (1981); Suter v. San Angelo Foundry and Machine Co., 81 N.J. 150, 406 A.2d 140, 145-46 (1979); Thibault v. Sears Roebuck & Company, 118 N.H. 802, 395 A.2d 843, 848-50 (1978); Daly v. General Motors Corp., 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162, 1171-72 (1978)
 
 
 [6]
 See e.g., Lippard v. Houdaille Industries, Inc., 715 S.W.2d 491, 493-94 (Mo.1986) (en banc ) ("We adhere to the view that distributors of 'defective products unreasonably dangerous' should pay damages for injuries caused by the products, without reduction because a plaintiff may have been guilty of a degree of carelessness"); Bailey v. V & O Press Co., Inc., 770 F.2d 601, 602 (6th Cir.1985) (applying Ohio law); Young's Machine Co. v. Long, 100 Nev. 692, 692 P.2d 24, 25 (1984); Kinard v. Coates Company, Inc., 37 Colo.App. 555, 553 P.2d 835 (1976)
 
 
 [7]
 See generally, Kinard v. Coats, 37 Colo.App. 555, 553 P.2d 835, 837-38 (1976). The Colorado Court of Appeals in Kinard emphasized its adherence to the strict products liability approach outlined in RESTATEMENT (SECOND) OF TORTS Sec. 402A. Kinard at 837; see also Note, Products Liability and Section 402A of the Restatement of Torts, 55 GEO.L.J. 286 (1966) (overview of relation between Sec. 402A and strict product liability actions). The court's rejection of comparative fault was unambiguous: "Although some other jurisdictions have chosen to apply comparative negligence to products liability cases ..., in our view the better-reasoned position is that comparative negligence has no application to products liability actions under Sec. 402A." Kinard at 837
 
 
 [8]
 See e.g., Downing v. Overhead Door Corp., 707 P.2d 1027, 1032 (Colo.App.1985); Daly v. General Motors Corp., 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162, 1181-86 (1978) (Mosk, J., dissenting); Kinard v. Coats, 37 Colo.App. 555, 553 P.2d 835, 837 (1976)
 
 
 [9]
 See generally Jiminez v. Sears, Roebuck & Co., 4 Cal.3d 379, 93 Cal.Rptr. 769, 482 P.2d 681, 683 (1971) ("in a products liability case the plaintiff in order to recover in strict liability in tort must prove that he was injured by a defect in the product and that the product was defective when it left the hands of the retailer or manufacturer; whereas to recover in negligence the plaintiff must prove the same two elements plus an additional element, namely, that the defect in the product was due to negligence of the defendant"). For two scholarly analyses exploring, inter alia, the economic efficiency and distributional equity rationales for allowing the application of strict liability without any showing of negligence, see also Prosser, supra, Sec. 99, at 694-95; Klemme, The Enterprise Liability Theory of Torts, 47 U.Colo.L.Rev. 153 (1976); Calabresi & Hirschoff, Toward a Test for Strict Liability in Torts, 81 Yale L.J. 1055 (1972)
 Strict liability is not synonymous with "absolute liability." In an absolute liability regime, the product defect inquiry would be superfluous. See generally, Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 424 (Tex.1984); Scott v. Rizzo, 96 N.M. 682, 634 P.2d 1234, 1240 (1981); Daly v. General Motors Corp., 20 Cal.3d 725, 144 Cal.Rptr. 380, 384, 575 P.2d 1162, 1166 (1978); Calabresi & Hirschoff, Toward a Test for Strict Liability in Torts, 81 Yale L.J. 1055, 1056 (1972) ("Strict liability has never meant that the party held strictly liable is to be a general insurer for the victim no matter how or where the victim comes to grief").
 
 
 [10]
 See generally Daly v. General Motors Corp., 20 Cal.3d 725, 144 Cal.Rptr. 380, 399-400, 575 P.2d 1162, 1181-82 (1978) (Mosk, J., dissenting) (noting with disapproval that a majority of the Supreme Court of California had injected the "foreign object" of negligence into the "pure concept of product liability")
 
 
 [11]
 See generally Lippard v. Houdaille Industries, Inc., 715 S.W.2d 491, 502 (Mo.1986) (en banc ) (Welliver, J., dissenting); Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 424-25 (Tex.1984); see also Prosser, supra, Sec. 67, at 479
 
 
 [12]
 Among the numerous dictionary definitions of "fault," one finds: "neglect," "failing," "a blameworthy moral weakness," "responsibility for wrongdoing or failure," and "a failure to do something required by law or the doing of something forbidden by law." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 829 (1981)
 
 
 [13]
 In our effort to consult the relevant legislative history of C.R.S. 13-21-406, we are aided by tape recordings of the General Assembly's deliberations. We note that the Supreme Court of Colorado frequently refers to these recordings in order to determine the intentions of the Colorado legislature, see e.g., Mesa Sand & Gravel Co. v. Landfill, Inc., 776 P.2d 362, 365 (Colo.1989) (en banc ); Charnes v. Central City Opera House, 773 P.2d 546, 554 n. 6 (Colo.1989) (en banc ); Blaine v. Moffat County School District RE No. 1, 748 P.2d 1280 (Colo.1988) (en banc ); People v. Guenther, 740 P.2d 971, 976 (Colo.1987) (en banc )
 
 
 [14]
 See generally, Tape Recordings of Senate Business Affairs and Labor Committee, Feb. 10, 16, 1981
 
 
 [15]
 The Colorado Supreme Court Committee on Civil Jury Instructions implicitly acknowledges that in the absence of express legislative definition, the comparative fault language is subject to evolving judicial interpretation. In its Special Note to Colorado Civil Jury Instruction 14:30, the Committee stated:
 The Committee recognizes that the General Assembly left unanswered many issues posed by the "comparative fault" statute (C.R.S. Sec. 13-21-406) and that the appellate courts have not yet had an opportunity to rule on these issues. The Committee's intent in drafting these instructions is not to resolve these issues but to provide the Bench and Bar with a basic structure from which to work in formulating appropriate instructions for the jury. * * *
 CJI-CIV.2d 14:30 (1980 & 1988 Supp.).
 
 
 [16]
 Senator Hefley (co-sponsor of S.B. 63, the bill that became C.R.S. 13-21-406), for example, indicated that the responsibilities of persons suffering or causing harm should be compared in establishing the amount of damages to be awarded. Tape Recordings of Senate Business Affairs and Labor Committee Hearing, Feb. 10, 1981 (statement of Senator Hefley)
 
 
 [17]
 We note that the Colorado Supreme Court Committee on Civil Jury Instructions has also interpreted C.R.S. 13-21-406 to subsume the negligent behavior of a plaintiff as a subset of the term "fault" as it is used in Colorado's comparative fault statute. CJI-CIV.2d 14:35 (Supp. issued in March 1989) ("Affirmative Defense--Comparative Fault Based on Negligence")
 
 
 [18]
 See e.g., Tape Recordings of the Senate Business Affairs and Labor Committee (February 16, 1981) (testimony of Mr. Perrill of the American Insurance Association, referring to Daly v. General Motors Corp., 20 Cal.3d 725, 575 P.2d 1162, 144 Cal.Rptr. 380 (1978))
 
 
 [19]
 We have applied a variety of standards in the past to describe the degree of deference to be accorded to a local district judge's interpretation of state law: compare, Wilson v. Al McCord, Inc., 858 F.2d 1469, 1473 (10th Cir.1988) (some deference) with Mullan v. Quickie Aircraft Corp., 797 F.2d 845, 850 (10th Cir.1986) (clearly erroneous). We would reach the same result in this case regardless of what standard of review is used
 
 
 [20]
 The statute provides in part:
 "(4) Witnesses in courts of record called to testify only to an opinion founded on special study or experience in any branch of science or to make scientific or professional examinations and state the result thereof shall receive additional compensation, to be fixed by the court, with reference to the value of the time employed and the degree of learning or skill required." C.R.S. 13-33-102(4).
 
 
 [21]
 28 U.S.C. Sec. 1821(b) provides, inter alia: "A witness shall be paid an attendance fee of $30 per day for each day's attendance." * * * *
 
 
 [22]
 "g. Defective condition. The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained
 "Safe condition at the time of delivery by the seller will, however, include proper packaging, necessary sterilization, and other precautions required to permit the product to remain safe for a normal length of time when handled in a normal manner.
 "i. Unreasonably dangerous. The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussollini as an instrument of torture. That is not what is meant by 'unreasonably dangerous' in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fusel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous." (emphasis added).
 
 
 [23]
 Caterpillar argues that: "it is a matter of 'common sense' that when the engine of a vehicle with hydraulically-assisted controls is turned off, the vehicle loses its hydraulic boost and requires greater than normal pressure to activate the controls." Opening/Answer Brief for Appellee/Cross-Appellant at 30. We think that the cross-appellant has an unrealistically expansive notion of what constitutes "common sense." The understanding of the basic functioning of hydraulic braking systems on pipelaying machines may require relatively elementary technical knowledge, but it is technical knowledge nonetheless
 
 
 [24]
 Although the Eighth Circuit's cases are in accord with Herndon (see e.g., Roth v. Black & Decker, Inc., 737 F.2d 779 (8th Cir.1984); Unterburger v. Snow Co., 630 F.2d 599 (8th Cir.1980)), we acknowledge that the other circuits do not share our perspective on this evidentiary issue. See, e.g., Annotation, Admissibility of Evidence of Subsequent Remedial Measures Under Rule 407 of the Federal Rules of Evidence, 50 A.L.R.Fed. 935 (1980); Flaminio v. Honda Motor Co., 733 F.2d 463, 469 (7th Cir.1984); Hall v. American Steamship Co., 688 F.2d 1062, 1066-67 (6th Cir.1982)
 
 
 [1]
 With respect to the interpretation of the term "event" in Rule 407, we note that Caterpillar's Motion in Limine below moved for an order barring the introduction of "subsequent remedial measures under Rule 407, Federal Rules of Evidence." Vol. I R., Item 1 at p. 1. The motion argued further that "Caterpillar should not be discouraged from implementing post-accident corrective measures in the future because of the adverse impact of Rule 407." (Emphasis added.) Id. at 2. The prayer in the motion then requested an order "barring the introduction of evidence of post-accident remedial measures, which measures were both economically and technologically feasible at the time of manufacture of the allegedly defective product." (Emphasis added.) Id. at 2
 In this connection, we further note that Caterpillar's Reply to Plaintiff's Response to the petition for rehearing argues that there is a gross misstatement of facts by the assertion of plaintiff that introduction of spring-applied brakes into the Model 561D pipelayer "was a prior redesign which was entirely completed before the date of manufacture of the pipe layer [sic ] that killed Garry Huffman." Reply at 1-2. This argument of Caterpillar is flawed because Caterpillar is referring to the manufacture of the first Model 561D with spring-applied brakes in March 1981, which was manufactured approximately four months before the fatal accident and death of Garry Huffman on July 29, 1981.
 
 
 [2]
 See Kurop, TR. at 352 ("Caterpillar not only knew about these devices [spring-applied brakes] as early as 1960, but as early as 1971 was applying them to other machines in their product line-up."); Jefferson, TR. at 1255 (explaining that development of design of spring-applied brakes for the 561D began in 1979 as part of Caterpillar's "ongoing efforts to reduce operator efforts in general"); Allen, TR. at 1327 (Caterpillar's work on design of spring-applied brakes began "in 1978 or '79"). This testimony was unrebutted by the defendants. To correct and clarify the chronology, we are filing with this Order a revised page 3 to our opinion of April 18, 1990, in this case. That revision substitutes two new sentences at the beginning of the concluding paragraph on page 3 for the initial sentence of that concluding paragraph in our original opinion