IOWA–ILLINOIS GAS & ELECTRIC COMPANY, Iowa Power & Light Company, Interstate Power Company, Plaintiffs,

and

The Home Insurance Company, Appellant,

v.

BLACK & VEATCH, Appellee.

No. 91–1300.

Supreme Court of Iowa.

March 24, 1993.

Larry L. McMullen & James M. Warden of Blackwell Sanders Matheny Weary & Lombardi, Kansas City, MO, and Elliott R. McDonald III of McDonald, Stonebraker & Cepican, P.C., Davenport, for appellee.

Carol A.H. Freeman of Lane & Waterman, Rock Island, IL, and James T. Ferrini and Imelda Terrazino of Clausen Miller Gorman Caffrey & Witous, P.C., Chicago, IL, for appellant.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and NEUMAN, JJ.

McGIVERIN, Chief Justice.

Plaintiff Home Insurance Company, as a subrogee, appeals from a judgment entered on a jury verdict finding defendant Black & Veatch had not breached its contract with several power companies. Home contends the trial court erred in admitting challenged evidence and in giving certain jury instructions. Home further contends its motion for a new trial should have been granted because of jury misconduct.

We affirm the district court judgment.

I. *Background facts and proceedings.* Iowa–Illinois Gas and Electric Company, Iowa Power and Light Company, and Interstate Power Company (referred to collectively as Iowa–Illinois) are co-owners of the Louisa Generating Station in Louisa County. Appellant Home Insurance Company issued a policy of insurance to Iowa–Illinois covering property damage to the Louisa station.

In July 1977, Iowa–Illinois entered into a contract with Black & Veatch consulting engineers (Black) regarding the construction of a new electric generating unit at Louisa. The unit was to generate supplemental electrical energy when needed by Iowa–Illinois. Black was to provide, among other things, engineering and project field management services, and detailed construction plans and specifications for all structural, mechanical, and electrical work. Black agreed to perform the services in accordance with the highest standards of the engineering profession.

A. *The MOD switch design.* Louisa was released for commercial operation in October 1983. It is a steam electric generating unit intended to be shut down on weekends and holidays or as the demand for electricity required. Therefore, the designers estimated that the Louisa unit would come off-line about 200 times a year.

The Louisa station consists of a main plant and a substation. When the plant is on-line, the electricity produced in the generator first travels into a transformer where the voltage is increased, and then out to the substation. In the substation, the voltage travels to a motor-operated disconnect switch (MOD), identified specifically as MOD 93–947, then through a ring bus, and finally out to an interconnected grid.

The ring bus allows electricity to pass into the grids or overhead power lines. Two circuit breakers at intervals along the ring bus regulate the load current. When the circuit breakers are closed, the flow of electricity is unimpeded along the ring bus. When the breakers are open, the current is interrupted.

The MOD switch is used to isolate equipment and is usually operated remotely from the plant's control room. At Iowa–Illinois' insistence, however, the MOD switch involved here may also be operated locally for maintenance or emergencies, using either an electrical button or a manual crank at the site of the MOD switch. The MOD switch is located away from the control room and has a fence with a locked gate around it. There is also a padlock on the MOD switch itself.

The MOD switch and the two circuit breakers isolate and protect the generator when the plant is off-line. When the MOD switch is open, it acts as a raised drawbridge that keeps the stepped up voltage already in the ring bus from flowing back into the generator while the plant is off-line. When the MOD switch is closed, electricity can travel over it and into the ring bus.

To prevent the reverse flow of electricity back into the generator, called back-energization, when the plant is off-line and in the process of being put back on-line, the circuit breakers must be *opened* before the MOD switch is closed. Once the MOD switch has been closed and the electricity is again traveling over it and into the ring bus, the circuit breakers are then closed to

return the ring bus back to normal operation.

During the planning and design of the Louisa station, Iowa–Illinois expressed to Black its concern that back-energization not occur whenever the plant was being put back on-line. As a result, Black devised an electric interlock scheme that prevented the operators from closing the MOD switch when the breakers were also closed. The interlock protection would activate when the MOD switch was being operated by remote control at the control panel or by the local electrical button. The interlock would not activate, however, when the switch was being manually cranked closed.

In addition, Black provided instructions regarding operation of the MOD switch. These operating rules stated "[c]ontrol of MOD 93–947 can only be accomplished from the main plant control room. Local [manual] control of MOD is only for maintenance use with adjacent breakers open." Another operating rule stated *"[b]e sure that the adjacent breakers are open before closing these disconnects* [including MOD 93–947]." (Emphasis in original.)

Black apparently did not put any kind of interlock on the manual crank operation of the MOD switch because such a device could cause false trips of the circuit breakers, causing interruptions in service or injury to maintenance personnel working on the breakers. Besides being a potential safety hazard, such a device is also apparently cumbersome.

B. *The accident.* On July 14, 1984, the Louisa station was removed from service for the weekend. When Tom Sweeney, the afternoon shift supervisor, reported for work he was informed that repair work had been completed and he was to recouple the power to the MOD switch.

Sweeney and an apprentice went to the substation and recoupled the power. Sweeney, operating under the incorrect assumption that the circuit breakers were open, then directed his apprentice to close the MOD switch by pushing the local electrical button. Due to the electric interlock protection system, however, the MOD switch would not close as the circuit breakers

were in fact closed. Sweeney then directed the apprentice to manually crank the switch closed. When the apprentice got the MOD switch cranked partially closed, an electrical arc connected first one and then a second phase of the switch. As a result, electricity back-flowed to the generator through the MOD switch, causing the generator to operate as a "motor" for approximately twenty-six seconds.

This back-energization caused approximately $3 million worth of damage to the generator. Under its insurance policy, Home paid Iowa–Illinois for a portion of its property loss and is subrogated to Iowa–Illinois' rights against Black accordingly.

C. *The trial and subsequent proceedings.* Plaintiffs Iowa–Illinois and Home then filed this breach of contract action against Black. Iowa–Illinois and Home alleged that, pursuant to the written contract, Black had agreed to prepare detailed construction plans, including a safety system to prevent the back-energization, and that Black had breached the contract thereby resulting in the July 14 accident and consequent damage to the generator.

Black raised the affirmative defenses that Iowa–Illinois' negligent acts were the sole proximate cause of the accident and resulting damages, and that Iowa–Illinois had a contractual duty to properly train the operators and implement proper switching procedures.

Plaintiffs filed motions *in limine* objecting to the introduction of evidence regarding the training and disciplining of Iowa–Illinois employees and Iowa–Illinois switching procedures. The trial court overruled these motions. Plaintiffs renewed their objections on the ground of relevancy throughout the trial but the objections were overruled.

Plaintiffs also objected to the admission of various items of evidence, including their report to the Iowa State Commerce Commission regarding the cause of the accident, an expert witness for the defense, an employee letter to Iowa–Illinois' company president, a memo indicating Home's interest in the accident, Sweeney's misoper-

ation of the MOD switch, and Iowa–Illinois' employee training and implementation of switching procedures. Iowa–Illinois also objected to jury instructions 15 and 18, which contained Black's affirmative defenses.

After a lengthy trial, the jury eventually returned a verdict in favor of Black, finding that Black had not breached its contract. Plaintiffs moved for a new trial asserting numerous errors, including the jury's alleged misconduct in consulting a dictionary for the definitions of certain terms. The district court denied a new trial and entered judgment on the verdict for defendant.

Only appellant Home Insurance Company appealed the final judgment.

■ II. *Breach of contract.* Appellant Home contends that Black breached its contract with Iowa–Illinois by not designing a back-energization scheme, in accordance with the highest standards of the engineering profession, which would have prevented Sweeney's accident of July 14, 1984. Home seems to assert that whether Black breached its contract is a legal question that was reserved for the court, and not the jury.

■ In a breach of contract claim, the complaining party must prove 1) the existence of a contract, 2) the terms and conditions of the contract, 3) that it has performed all of the terms and conditions required under the contract, 4) the defendant's breach of the contract in some particular way, and 5) that plaintiff has suffered damages as a result of the breach. *Berryhill v. Hatt,* 428 N.W.2d 647, 652 (Iowa 1988).

Here, no one disputed the existence of the contract or that Iowa–Illinois suffered damages from the back-energization. However, Iowa–Illinois' required performance and Black's alleged breach were disputed. Although no one disputed that Black was to design a system in accordance with the highest standards of the engineering profession, the exact substance of those standards was in dispute. We believe these issues generated jury questions.

■ The construction of a contract, the legal effect of the contract, is always a matter for the court. *Connie's Constr. v. Fireman's Funds Ins.,* 227 N.W.2d 207, 210 (Iowa 1975). Interpretation, the meaning of contractual words, is also an issue for the court *unless* it is dependent upon extrinsic evidence or upon a choice among reasonable inferences from the extrinsic evidence. *Id.* Extrinsic evidence is admissible as an aid to interpretation when it throws light on the parties' situation, antecedent negotiations, the attendant circumstances, and the objectives the parties were trying to attain. *Taylor Enter., Inc. v. Clarinda Prod. Credit Ass'n,* 447 N.W.2d 113, 115 (Iowa 1989). Generally, questions of performance or breach are for the jury. *Id.* at 116.

In the present case, the meaning of "highest standards of the engineering profession" was disputed. Interpreting its meaning depended upon evaluating extrinsic evidence, including expert witness testimony. Whether Black breached its contract was dependent upon whether it performed according to the highest standards of the profession. Therefore, we believe a jury question existed and conclude the trial court properly submitted the question of breach to the jury.

III. *Admission of various items of evidence.* Appellant Home next contends the trial court erred in admitting certain evidence over its relevancy and other objections, including 1) Sweeney's misoperation of the MOD switch and Iowa–Illinois' employee training and switching procedures, 2) a protest letter from Iowa–Illinois employees to Iowa–Illinois' company president, 3) Iowa–Illinois' responses to the Commerce Commission, 4) a memo confirming Home's desire to have input on Iowa–Illinois' responses to the Commerce Commission and on its answers to interrogatories in this litigation, and 5) Robert Harbour's expert testimony for Black. We conclude the trial court did not abuse its discretion in admitting any of this evidence.

■ Relevancy and materiality of evidence are usually matters for the trial

court's discretion. *Hulme v. Barrett,* 449 N.W.2d 629, 634 (Iowa 1989). We will not interfere in those decisions unless the trial court clearly abused its discretion to the prejudice of the complaining party. *Id.*

■ A. *Switch misoperation, training, and procedures.* Home contends the trial court erred in admitting evidence of Sweeney's misoperation of the MOD switch and of Iowa–Illinois' training of employees and implementation of switching procedures. Home argues this evidence was irrelevant to whether Black breached its contract. We disagree and conclude the evidence is quite relevant.

Sweeney's misoperation of the MOD switch is directly relevant to whether Iowa–Illinois' damages were caused by Black's breach of the contract or by something else. In *Woods v. Schmitt,* 439 N.W.2d 855 (Iowa 1989), the plaintiff buyer sued its own lawyer and the seller's lawyer for breach of contract because the title of the real property plaintiff bought was clouded. We held that the buyer had the burden to show the breach caused its damages. We further said that because questions of proximate cause are for the jury, a jury question existed as to whether the contracts were breached. *Id.* at 864. Therefore, we conclude the trial court here properly admitted evidence of Sweeney's misoperation of the switch because the jury needed the information to decide whether Black's potential breach of contract was the cause of plaintiff's damages.

We also conclude Iowa–Illinois' training of its employees and implementation or lack of switching procedures was directly relevant both to whether Black breached the contract and to the cause of the damages.

The parties here disagreed as to whether training and switching procedures were even a part of the contract. This evidence and the corresponding question were thus properly submitted to the jury. *See Connie's Construction,* 227 N.W.2d at 210. Moreover, this evidence was directly relevant to the cause of the accident: if Black properly designed the interlock system but Iowa–Illinois' employees were not properly trained and lacked appropriate switching procedures, the accident may still have happened.

Most important, however, the evidence is relevant to the professional standards to which Black would be held. Black's witnesses testified that Iowa–Illinois' employee training and implementation of switching procedures were an integral part of the design scheme. Black designed the interlock system to prevent the MOD switch from closing while the circuit breakers were closed when the switch was being operated remotely from the control panel or locally with the electrical button. The design presumed that Iowa–Illinois would have trained its operators *never* to close the MOD switch when the breakers were closed. The design further presumed that Iowa–Illinois would provide proper switching procedures and forms to ensure that all possible precautions had been taken and all appropriate procedures followed when closing the switch. The design finally presumed that the switch would be *manually* cranked open and closed *only* for maintenance and emergency purposes, as Iowa–Illinois itself had requested. The jury impliedly found these presumptions to be the understanding between Black and Iowa–Illinois. Black then could only be expected to design an interlock system fitting this understanding. Black could thus not be expected to design an interlock system to prevent all possible back-energization where employees completely failed to follow operating instructions and were not properly trained.

The trial court therefore did not abuse its discretion in admitting evidence of Sweeney's misoperation of the MOD switch and of Iowa–Illinois' employee training and implementation of switching procedures. Such evidence was directly relevant to the cause of Iowa–Illinois' damages and to the standards to which Black was to be held.

■ B. *The employees' letter to the Iowa–Illinois company president.* Home next contends the trial court erred in admitting a letter written by employees to the Iowa–Illinois company president protesting Sweeney's firing after the accident. The

employees wrote that Sweeney could not be completely to blame for the accident because Iowa–Illinois' training of its employees had been inadequate.

Black did not try to use the letter until Louis Inghram, Iowa–Illinois' Louisa station superintendent, testified that Iowa–Illinois had a strong training program and that no one had ever told him the employees' training had been inadequate. At that point, Black's counsel used the letter to impeach Inghram. The letter was admitted only for this impeachment purpose over Home's relevancy objection.

We conclude the trial court did not abuse its discretion in admitting the letter to impeach Inghram.

■ C. *Iowa–Illinois' report to the Commerce Commission.* Home asserts the trial court further erred in admitting into evidence over Home's relevancy objection Iowa–Illinois' report to the Iowa State Commerce Commission, which explained Iowa–Illinois' belief as to the cause of the accident. This report in substance stated the accident was caused by the negligence of its employee, Sweeney, and did not attribute blame to Black. The court admitted the report as relevant and an admission against interest. We agree that it was an admission and conclude the trial court did not abuse its discretion in admitting the report.

D. *Memo between Iowa–Illinois counsel and Charles Snyder.* Home also contends the trial court erred in admitting a memo from Iowa–Illinois counsel E.J. Hartman to Iowa–Illinois employee Charles Snyder. The memo concerned Home's request to have input in Iowa–Illinois' responses to the Commerce Commission regarding the nature and cause of the Sweeney accident. The memo also states that Home's counsel, Armbrust, called Hartman to discuss the same responses.

In view of the record at that stage of the trial, we conclude the trial court did not abuse its discretion in admitting this memo over Home's relevancy objections.

■ E. *Expert witness testimony of Robert Harbour.* Home next contends the trial court erred in admitting the testimony of Robert Harbour. Appellant argues that because Harbour is not an expert in back-energization he should not have been allowed to testify as to the standards of the engineering profession in this regard and consequently to whether Black breached the contract or performed within the highest standards of the engineering profession.

■ Receipt of opinion evidence, lay or expert, is a matter within the trial court's discretion. *Ganrud v. Smith,* 206 N.W.2d 311, 314 (Iowa 1973). We will not reverse the trial court's receipt absent a manifest abuse of that discretion to the prejudice of the complaining party. *Id.* We are committed to a liberal rule on the admission of opinion testimony, and only in clear cases of abuse would the admission of such evidence be found to be prejudicial. *Id.* at 314–15.

Opinion testimony is allowed if it will aid the jury in determining the case and is based on some special training, experience or knowledge of the witness. *Id.* at 314; Iowa R.Evid. 702. Expert testimony can embrace ultimate issues to be decided by the jury, *see* Iowa Rule of Evidence 704, but the witness may not testify as to legal standards, such as whether a party was negligent or whether a product was unreasonably dangerous, *see* Iowa Rule of Evidence 704 committee comment.

Harbour had extensive experience in the field of utility power stations. At time of trial, he was vice-president and assistant general manager of Soyland Power Cooperative, which supplies power to twenty-one electric distribution properties covering approximately 60% of the Illinois land mass. Prior to that position, he had spent thirty-one years at Iowa Southern Utilities company in Iowa. He had served as maintenance supervisor at the Burlington plant, with responsibility for all electrical and mechanical maintenance of the power plant and its substation. He then served as system planning engineer, with responsibility for relaying and system control. He subsequently became manager of the engineering department and vice-president of Iowa

Southern, having responsibility for construction and design of substations and total responsibility for the Iowa Southern Utilities power plants. In his later years at Iowa Southern, Harbour even served as the utility's president. Finally, Harbour has also served as chairman of the Mid–Continent Area Power Pool, which oversees the provision of electricity in the upper midwest of the United States.

At the Burlington generating station and during his other years at Iowa Southern, Harbour developed familiarity with various back-energization protection schemes. In fact, as he was responsible for substation design of the Ottumwa generating station, Harbour participated in its back-energization scheme design.

Harbour had also been involved in negotiating and administering contracts with consulting engineers, including Black.

The trial court understandably admitted Harbour's testimony as that of an expert and properly allowed Harbour to testify as to the standards of the engineering profession regarding back-energization protection and whether Black's back-energization protection design fell within those standards. Therefore, we conclude the trial court did not abuse its discretion in admitting Harbour's expert testimony.

■■■■ IV. *Jury instructions 15 and 18.* Home asserts the trial court erred in giving the jury instructions 15 and 18. Instruction 15 involved Black's affirmative defense that Iowa–Illinois did not fulfill its duties under the contract to properly train its employees and implement switching procedures. Instruction 18 involved Black's other affirmative defense that Iowa–Illinois' conduct in failing to train its employees and implement switching procedures was the sole proximate cause of the damages.

An error in giving or refusing to give an instruction is not reversible unless the error was prejudicial. *Stover v. Lakeland Square Owners Ass'n,* 434 N.W.2d 866, 868 (Iowa 1989).

■■■ Jurors are given the credit of ordinary common sense and honest purpose to dispose of questions submitted to them upon the evidence under the instructions given by the court. *Jones v. Iowa State Highway Comm'n,* 185 N.W.2d 746, 751 (Iowa 1971). It is assumed the jury at all times heeded and complied with the instructions so given. *Id.*

In the present case, under special verdict forms the jury found that plaintiffs had not proved that Black had breached its contract. Accordingly, the jury never reached the affirmative defenses stated in instructions 15 and 18 and which were the subject of later special verdict forms. Therefore, we conclude the appellant suffered no prejudice concerning the challenged instructions. There is no merit to this assignment.

■■■ V. *Jury misconduct.* Finally, appellant Home contends the jury committed misconduct in looking up certain words in a dictionary. Home says this warranted granting its motion for a new trial, which the trial court overruled.

■■■ Trial courts have broad discretion in passing on motions for new trials. *Thompson v. Rozeboom,* 272 N.W.2d 444, 446 (Iowa 1978). Only when the evidence clearly shows an abuse of discretion will we interfere with the trial court's ruling on such a motion. *Id.*

■■■ The trial court also has wide discretion in determining whether alleged jury misconduct is prejudicial. *Harris v. Deere & Co.,* 263 N.W.2d 727, 729 (Iowa 1978); *In re Estate of Cory,* 169 N.W.2d 837, 845 (Iowa 1969). Unless an abuse of discretion is clearly shown, the trial court should not be reversed. *In re Estate of Cory,* 169 N.W.2d at 845.

Our Iowa rule of evidence 606(b) protects "each of the components of deliberation including juror arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process occurring in the jury room." *Ryan v. Arneson,* 422 N.W.2d 491, 495 (Iowa 1988). Therefore, jurors are incompetent to "testify to any matter or statements occurring in the course of deliberations...." *Id.* However, the district court may still consider

juror testimony regarding "whether extraneous prejudicial information was improperly brought to the jury's attention...." Iowa R.Evid. 606(b). *See also Doe v. Johnston,* 476 N.W.2d 28, 34 (Iowa 1991). The key distinction is "between the internal workings of the jury and external pressures brought to bear on the decision-making process." *Hobbiebrunken v. G & S Enter., Inc.,* 470 N.W.2d 19, 22 (Iowa 1991).

In the present case, one of the jurors signed an affidavit stating two jurors used a dictionary to look up the terms "sole," "proximate," "highest," "standard," "engineering" and "profession." The entire jury apparently discussed the definitions.

Here, the trial court properly considered the juror's statement that dictionary definitions had been brought into the jury room. The court additionally properly ignored the juror's statements regarding the effect, or lack thereof, the definitions had on the jury's deliberations. *See Lund v. McEnerney,* 495 N.W.2d 730, 734 (Iowa 1993); *Doe,* 476 N.W.2d at 34.

After proving that extraneous material reached the jury room, appellant had to prove that the misconduct was calculated to, and with reasonable probability did, influence the verdict. *Doe,* 476 N.W.2d at 35. "The impact of the misconduct is to be judged objectively by the trial court in light of all the allowable inferences brought to bear on the trial as a whole." *Id.*

In this regard, two other Iowa cases have held that juror misconduct of looking up words in a dictionary is not a basis for granting a new trial. In *In re Estate of Cory,* 169 N.W.2d 837, a will contest based on undue influence, a juror looked up in the dictionary the terms "undue" and "undue influence" and shared the definitions with the other jurors. We affirmed the trial court's denial of a new trial, concluding that the dictionary definitions were no different than the jurors' common knowledge of the terms. In *Harris,* a products liability case, a juror looked up in a dictionary the terms "control" and "lever." 263 N.W.2d at 729. We upheld the trial court's denial of a new trial.

No competent evidence indicates the misconduct here improperly influenced the jury. We conclude the trial court did not abuse its discretion in overruling Home's motion for a new trial based on the jury's misconduct.

VI. *Disposition.* We conclude the trial court did not err or abuse its discretion in the above matters. Therefore, we affirm the judgment in all respects.

**AFFIRMED.**