**AMERUS BANK, Plaintiff,**

v.

**PINNACLE BANK, as Successor of Indiana Federal Bank for Savings, Defendant.**

**Pinnacle Bank, Counterclaim–Plaintiff,**

v.

**Amerus Bank, Counterclaim–Defendant.**

No. 4–98–CV–90314.

United States District Court, S.D. Iowa, Central Division.

June 9, 1999.

J. Michael Vaughan, Kansas City, MO, W. Don Brittin, Jr., John F. Lorentzen, Des Moines, IA, for Plaintiff/Counterclaim Defendant.

Bret A. Dublinske, Jon P. Sullivan, Des Moines IA, for Defendant/counterclaim Plaintiff.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

PRATT, District Judge.

This matter comes before the Court on Defendant Pinnacle Bank's [hereinafter Defendant or Pinnacle] Motion for Summary Judgment, filed on December 9, 1998. Defendant seeks summary judgment on all of Plaintiff's claims. On April 12, 1999, Plaintiff AmerUs Bank [hereinafter Plaintiff or AmerUs] filed its Resistance to Defendant's Motion for Summary Judgment and on April 22, 1999 Defendant filed its Reply. No hearing on this matter is deemed necessary and the matter is now considered fully submitted.

### I. Background Facts and Proceedings

The following facts are either undisputed or viewed in the light most favorable to the nonmoving party for the motion being considered. *See United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir. 1990); *Woodsmith Publ'g Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990). In June 1996, AmerUs and Indiana Federal Bank For Savings [hereinafter Indiana Federal] negotiated for the sale of a portfolio of second mortgage loans (i.e. home equity loans) then held by AmerUs. It is undisputed that at the time of negotiations both AmerUs and Indiana Federal were sophisticated business enterprises, experienced in the buying and selling of loans. There was no disparity of bargaining power and both were represented by counsel.

At the close of negotiations, Elizabeth Swanson, (counsel for AmerUs) provided a form Purchase and Sale Agreement and a form Loan Servicing Agreement, both of which had been previously developed by AmerUs, to Jim Jorgensen (counsel for Indiana Federal bank) for his review. (See Swanson Affidavit, ¶ 4). Jorgenson made some initial changes to the forms in order to tailor them to the Indiana Federal transaction. The Purchase and Sale Agreement and the Loan Servicing Agreement were both entered into as of June 12, 1996. The Court finds several clauses are particularly pertinent to its analysis.

Article I of the Loan Servicing Agreement provides definitions for words or phrases used within the contract. In this section "Excess Servicing Fee" is defined as "the difference between interest accrued on the Mortgage Loans at the Loan Rate and interest computed at the Remittance Rate."

Article VI of the Loan Servicing Agreement provides the general servicing procedure guidelines. Section 6.1, which is entitled "Servicing Compensation" provides in pertinent part that "[a]s compensation for its services hereunder, Servicer shall be entitled to retain the Excess Servicing Fee and the Supplemental Fees." Article X, Section 10.10, entitled "Servicer's Fee" further provides that "Servicer shall not receive a separate servicing fee under this Agreement. The pricing mechanism in the Purchase Agreement in part includes the consideration which Servicer receives."

Article IX of the Servicing Agreement provides for various ways in which the servicing contract may be terminated. Paragraph 9.1,[1] which is the only para-

---

1. Both AmerUs and Pinnacle ask the Court to consider the circumstances surrounding the inclusion of this paragraph in the Loan Servicing Agreement. As the Court finds that such evidence amounts to inadmissible parol evidence, the Court does not consider it for the purposes of deciding this motion. *See Montgomery Properties Corp. v. Economy Forms Corp.,* 305 N.W.2d 470, 476 (Iowa 1981) (holding that as a general rule, an agreement is fully integrated when the parties involved adopt a writing as the final and complete expression of their agreement. When this occurs extrinsic parol evidence may not be used to contradict or even supplement the terms of any such agreement); *see also* Restatement (Second) of Contracts § 213 (1981).

graph contained in this article states as follows:

>This Agreement shall continue in existence and effect until terminated as herein provided. If not earlier terminated pursuant to Section 8.1 above, the respective obligations and responsibilities of Servicer shall terminate with respect to each Mortgage Loan upon the earlier of: (a) the final payment or other liquidation of such Mortgage Loan and the remittance of all funds relating to such Mortgage Loan hereunder, (b) the mutual consent of Servicer and the Owner in writing to terminate this Agreement with respect to such Mortgage Loan; or (c) the later of the date on which servicing is transferred or *sixty (60) days after receipt by Servicer of written notice from Owner of Owner's intent to transfer servicing to a third party without cause.* Written notice pursuant to the preceding clause (c) of this Section shall be received by the Servicer not less than sixty (60) days from the proposed transfer date. (emphasis added).

The Court also finds it worthy to note the explicit lack of a penalty provision in either agreement for early cancellation.

On or about July 30, 1997, Indiana Federal merged with Pinnacle, with Pinnacle emerging as the surviving entity. As successor, Pinnacle assumed Indiana Federal's rights and obligations under the Loan Servicing Agreement at issue in this case. On or about March 30, 1998, nearly two years after the Agreements were signed, Pinnacle gave AmerUs notice that it intended to terminate the Servicing Agreement in no less than sixty days, and that it "intend[ed] to transfer the servicing of the Mortgage Loans ... to Guaranty Federal Bank." (See Def.'s Ex. M). At that time, Guaranty Federal Bank [hereinafter Guaranty] was also a *potential* buyer for the loan portfolio and wanted to be able to choose a different servicer or service the loans itself.

On April 3, 1998, AmerUs wrote a letter to Pinnacle stating in part as follows:

"AmerUs Bank disputes your contention concerning the right of Pinnacle Bank to pull servicing from AmerUs Bank." (See Def.'s Ex. N.) On May 4, 1998, AmerUs filed this action. Thereafter, on May 20, 1998, counsel for AmerUs wrote a letter to counsel for Pinnacle stating in part as follows:

>Section 9.1(c) permits termination "sixty (60) days after receipt by Servicer of written notice from Owner of Owner's intent to transfer servicing to a third party without cause." (Emphasis added.). Pinnacle's termination of the Agreement under section 9.1(c) is ineffective unless servicing is transferred to a bona fide third party. Unless the transfer of servicing is to a bona fide third party, AmerUs will not recognize Pinnacle's attempt to terminate the agreement under section 9.1(c), and AmerUs will continue to exercise its rights to provide servicing for the mortgage loans under the terms of the Agreement. AmerUs would agree to terminate the Agreement, under the provisions of section 9.1(b) provided Pinnacle will continue to pay AmerUs the Excess Servicing Fee, as defined by the Agreement, for the life of the mortgage loans notwithstanding termination. Alternatively, AmerUs would agree to terminate the Agreement in consideration of the immediate payment of the present value of the Excess Servicing Fee for the life of the mortgage loans.

(See Def.'s Ex. O). In the present action AmerUs Bank makes two claims against Pinnacle. First, AmerUs claims that pursuant to the Sale and Purchase Agreement, it was entitled, as consideration for the sale of the mortgage loans, to receive an Excess Servicing Fee from Pinnacle, and that Pinnacle breached the Purchase and Sale Agreement as well as the corresponding Loan Servicing Agreement by refusing to pay such fee after the effective termination date. Second, AmerUs claims that, as a result of a mutual mistake, or a unilateral mistake by AmerUs

and inequitable conduct by Indiana Federal, a provision was included in the Servicing Agreement by which a successor servicer, on termination of the Servicing Agreement, would succeed to all rights of AmerUs. In support of this second claim, AmerUs contends that the intent of AmerUs and Indiana Federal in entering the Servicing Agreement was that AmerUs' right to receive the Excess Servicing Fee could not be terminated as a result of the termination of the Servicing Agreement.

Pinnacle claims, on the other hand, the contracts at issue are clear and unambiguous, and that it properly and effectively terminated the Loan Servicing Agreement pursuant to Article IX.

## II. Legal Standard

The purpose of summary judgment is to "pierce the boilerplate of the pleading and assay the parties' proof in order to determine whether trial is actually required." 11 Matthew Bender, *Moore's Federal Practice*, § 56.02, at 56–207 (3d ed.1997), (citing *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)). Summary judgment "allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to [conserve] scarce judicial resources." *Id.* § 56.02

The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Handeen v. Lemaire*, 112 F.3d 1339, 1345 (8th Cir. 1997) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994); *Walsh v. United States*, 31 F.3d 696, 698 (8th Cir.1994); *City of Columbia*, 914 F.2d at 153; *Woodsmith Publ'g*, 904 F.2d at 1247. The court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed.R.Civ.Pro. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis added). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material ... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## III. Analysis

■ There are two overriding legal principals which govern the Court's analy-

sis in this case. First, while interpretation of the meaning of contractual words may be either for the court or the jury to decide, the legal effect of a contract is always a matter for court determination.[2] *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993); *see also Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 299 (Iowa 1994). In construing a contract, the court is guided by the " 'cardinal principle' that the parties' intent, at the time the contract was formed, controls, 'and except in cases of ambiguity, this is determined by what the contract itself says.' " *Amerus Property Brokers v. Hicklin, Sr.*, 585 N.W.2d 245, 247 (Iowa 1998) (citing Iowa R.App.P. 14(f)(14)); *see also Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 299 (Iowa 1994); *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 618 (Iowa 1991) (citing *Cairns v. Grinnell Mut. Reins. Co.*, 398 N.W.2d 821, 823 (Iowa 1987)). "An ambiguity exists if, after the application of pertinent rules of interpretation to the policy, a genuine uncertainty results as to which one of two or more meanings is the proper one." *Cairns v. Grinnell Mut. Reins. Co.*, 398 N.W.2d 821, 824 (Iowa 1987). If the parties' intent is clear and unambiguous from the words of the contract, however, the court must enforce the contract as written. *Howard v. Schildberg Constr. Co.*, 528 N.W.2d 550, 555 (Iowa 1995).

▆▆▆ Second, courts must strive to give effect to all the language of a contract. *Gendler Stone Products Co. v. Laub*, 179 N.W.2d 628, 630 (Iowa 1970). Because an agreement is to be interpreted as a whole, in accordance with its common-ly accepted and ordinary meaning, an interpretation which gives a reasonable and effective meaning to all terms is preferred to one which leaves a part unreasonable or a term superfluous or of no effect. *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 26 (Iowa 1978) (citing Restatement (2d) of Contracts § 229 (1981)); *see also Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997). Under Iowa law it is also clear that instruments relating to the same transaction which are contemporaneously executed should be construed together.[3] *Allison Ford Sales v. Farmers State Bank*, 249 Iowa 261, 86 N.W.2d 896, 898 (1957); *Interstate Finance Corp. v. Brink*, 232 Iowa 733, 6 N.W.2d 120, 121–22 (1942).

The Court has thoroughly read through the motion, resistance and the contracts at issue in this case. Upon it's review the Court finds that AmerUs' claim that it was entitled to receive an Excess Servicing Fee from Pinnacle for the entire life of the loan and its claim of mutual mistake stem from its erroneous belief that the parties entered into *what amounts* to a Loan Participation Agreement rather than a Whole Loan Sale Agreement.

▆▆▆ A typical Loan Participation transaction involves a "lead" lender (e.g. in this case AmerUs) who transfers a percentage of a loan/mortgage to a "participant" (e.g. in this case Pinnacle), typically 50% to 95%, while retaining some interest in the transaction for itself. In these transactions, the "lead" lender usually retains the loan documentation, collects the loan payments from the borrower and allocates them between participant and itself.

---

**2.** Interpretation is an issue for the court unless it is dependent upon extrinsic evidence or upon a choice among reasonable inferences from the extrinsic evidence. *Iowa–Illinois Gas*, 497 N.W.2d at 825. In that situation, extrinsic evidence is admissible as an aid to interpretation if it "throws light on the parties' situation, antecedent negotiations, the attendant circumstances, and the objectives the parties were trying to attain." *Id.* citing *Taylor Enter., Inc. v. Clarinda Prod. Credit Ass'n*, 447 N.W.2d 113, 115 (Iowa 1989).

**3.** The Court notes that, in Iowa, extrinsic evidence is permitted when the claim is made that two contracts executed simultaneously are, in reality, one contract. *Taylor Enterprise, Inc. v. Clarinda Production Credit Ass'n*, 447 N.W.2d 113, 115 (Iowa 1989) (citing *Kirkwood v. Perry Town Lot & Improvement Co.*, 178 Iowa 248, 159 N.W. 774, 777 (1916).)

*See* Debora L. Threedy, *Loan Participations—Sales or Loans? Or is that the question?*, 68 Oregon Law Review 649, 649 (1989); *see also Woodson Co. v. Grover*, 813 F.2d 266, 270 (1987). A Whole Loan Sale Agreement, on the other hand, involves the situation where the mortgage originator (e.g.AmerUs) endorses the note and sells the whole loan to an investor (e.g. Indiana Federal) who then becomes the owner and holder. *See* Edward L. Rubin, *Learning from Lord Mansfield, Toward a Transferability Law for Modern Commercial Practice*, 31 Idaho L.Rev. 775, 793 (1995). By selling whole loans, the originator avoids interest rates and default and refinancing risks inherent in mortgage loans, while sometimes retaining servicing responsibility and garnering servicing fees. *Id.* "The difference in the transfers of ownership between participation and whole loan sales transactions is that the participation interest seller continues to hold legal title to the applicable loans as trustee for the benefit of all of the participation interest owners, whereas the seller of a whole loan conveys and transfers legal title to the buyer."[4] Fred I. Feinstein, *Financing Real Estate Transactions, Real Estate Loan Participation Agreements*, Illinois Institute for Continuing Legal Education (July, 1996).

▮ The Court's review of the two contracts signed in this case indicate that the parties to this action entered into a Whole Loan Sale transaction whereby AmerUs sold a portfolio of loans to Pinnacle (as successor in interest to Indiana Federal) without retaining any percentage of the loans for itself. Specifically Paragraph 5(a) of the Purchase and Sale Agreement indicates the "there will be a direct transfer, from Seller to Buyer, of title to the Notes and the Mortgages." Additionally, Paragraph 5(c) indicates that "[a]long with the applicable Note, the Assignment of Mortgages shall evidence the assignment by Seller to Buyer, *of all the interests of Seller.*" Further, there is no language in

the contracts which would indicate that the parties intended any other participation type arrangement. As the Court finds that any such language, if it existed, would be clear on the face of the contracts, the Court concludes that at the time of negotiations, the parties had a clear intent to enter into a Whole Loan Sale transaction rather than a Loan Participation transaction.

Having concluded that this transaction was a Whole Loan Sale transaction, the Court finds that once the mortgage notes were transferred to Pinnacle, AmerUs no longer maintained any interest in these mortgages and was only entitled to compensation for its actions of servicing the loans pursuant to the Loan Servicing Agreement. *See Amerus Property*, 585 N.W.2d at 247 (stating that in construing a contract, the court is guided by the " 'cardinal principle' that the parties' intent, at the time the contract was formed; controls, 'and except in cases of ambiguity, this is determined by what the contract itself says.' ").

Thus, the Court next analyzes the language contained in this Agreement and finds that taken together with the "Servicing Compensation" and "Servicer's Fee" language used in Articles VI and X of the Loan Servicing Agreement, the "Excess Servicing Fee" language as used in Article I of the Loan Servicing Agreement clearly provides that AmerUs is entitled to the "Excess Servicing Fee" solely as compensation for its services provided pursuant to the Loan Servicing Agreement. In fact, according to Section 10.10 of the Loan Servicing Agreement, the parties specifically did not agree to any separate servicing fee. Therefore; once AmerUs' services were terminated by either party, the Court concludes that AmerUs' entitlement to receipt of the excess servicing fee would also thereby be terminated. *See Fashion Fabrics*, 266 N.W.2d at 26 (stating that an

---

4. For example, the originator (seller) is said to continue to hold a participating interest. Generally, the originator retains title and

owns 5% to 50% of the principal balance of the loan.

interpretation of a contract which gives a reasonable and effective meaning to all terms is preferred to one which leaves a part unreasonable or a term superfluous or of no effect.).

The Court has also read through the termination clause included in the Loan Servicing Agreement and finds that, even taking the facts in the light most favorable to AmerUs as the nonmoving party to this action, Pinnacle properly terminated the servicing agreement under the terms of Article IX. As stated previously, Paragraph 9.1 allows for termination of the Loan Servicing Agreement upon the happening of various conditions, one such condition being that "the later of the date on which servicing is transferred or *sixty (60) days after receipt by Servicer of written notice from Owner of Owner's intent to transfer servicing to a third party without cause.*" (emphasis added). The facts are undisputed that on or about March 30, 1998 Pinnacle gave AmerUs notice that it intended to terminate the Loan Servicing Agreement in no less than sixty days, and that it "intend[ed] to transfer *the servicing* of the Mortgage Loans ... to Guaranty Federal Bank." (emphasis added). While it is also undisputed that at that time, Guaranty was a *potential* buyer for the loan portfolio, the Court finds that this information is irrelevant in regards to the timing of the relevant events in this case. Even if Pinnacle sold the loan portfolio to Guaranty on the following day, that does not change the fact that at the time Pinnacle gave its written notice of intent to transfer the loan servicing, it was still the owner of such notes, and Guaranty was a bona fide *third party* transfer. Therefore, once this notice was received by AmerUs, in accordance with Articles IX and X of the agreement, the Loan Servicing Agreement was effectively terminated, and Guaranty succeeded to all rights and assumed all the responsibilities, duties and liabilities of the Servicer. *See Amerus Property,* 585 N.W.2d. at 247. AmerUs was therefore no longer entitled to receive the Excess Servicing Fee.

## IV. Conclusion

Based on the foregoing, the Court finds that the parties' intent in forming the contracts at issue is clear and unambiguous from the words used in the contracts themselves and therefore the contracts should be enforced as written. *See Howard,* 528 N.W.2d at 555. Even if the Purchase and Sale Agreement and the Loan Servicing Agreement are read together, the Court finds that no fact question is generated as to whether the parties intended that AmerUs be entitled to receipt of the Excess Servicing Fee in the event that Pinnacle terminated the servicing agreement. *Taylor Enterprise,* 447 N.W.2d at 116) (citing *Des Moines Blue Ribbon Dist., Inc. v. Drewrys Ltd., U.S.A. Inc.,* 256 Iowa 899, 129 N.W.2d 731, 735 (1964)); *Kirkwood,* 159 N.W. at 777. Consequently, there are no questions of fact for the jury to decide and Defendant's Motion for Summary Judgment must be **granted.** The Clerk of Court is directed to enter judgment in favor of Pinnacle and against AmerUs on all counts of Plaintiff's Complaint.

**IT IS SO ORDERED.**