John DOE and Mary Doe, Appellants,

v.

Richard JOHNSTON, Appellee.

No. 90–448.

Supreme Court of Iowa.

Sept. 18, 1991.

Rehearing Denied Oct. 23, 1991.

**30**

James W. Carney of Carney, Hudson, Williams, Blackburn & Grask, Des Moines, and Ronald Fitzpatrick and Thomas Fitzpatrick, LaCrosse, Wis., for appellants.

Robin L. Hermann and Douglas Haag of Patterson, Lorentzen, Duffield, Timmons, Irish, Becker & Ordway, Des Moines, for appellee.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, NEUMAN, and ANDREASEN, JJ.

NEUMAN, Justice.

This medical malpractice case concerns the scope and adequacy of informed consent secured from a surgery patient who developed transfusion-associated acquired immunodeficiency syndrome (AIDS). A jury returned a verdict in favor of the surgeon and this appeal followed. We affirm.

The operative facts are largely undisputed. In February 1985 defendant Richard Johnston—an orthopedic surgeon—performed a total hip replacement on a fifty-year-old patient identified in these proceedings as John Doe. The procedure was successful and no allegations of negligence are made about the surgery itself. As part of his postoperative recovery, however, Doe received a blood transfusion ordered by Dr. Johnston. Two years later, in February 1987, Doe learned that the donor of the transfused blood carried the human immunodeficiency virus (HIV). Subsequent tests revealed that Doe had acquired the dread disease AIDS.

Doe and his wife brought this action against Iowa Methodist Medical Center, The Blood Center of Central Iowa, and Dr. Johnston. The hospital and blood bank ultimately settled with the plaintiffs, and tri-al proceeded solely against the doctor. The controversy centered on whether the transfusion ordered by Dr. Johnston was medically necessary, and whether the doctor breached the standard of medical care by failing to warn Doe of the risk of acquiring AIDS through a blood transfusion or, in the alternative, failing to advise him of the possibility of self-donating the necessary units of blood. This latter procedure is known as an autologous transfusion.

Exceptionally well-qualified witnesses from across the country offered their expert opinions on these issues, pro and con. The jury listened to fifteen days of testimony from specialists in epidemiology, pathology, hematology, and orthopedic surgery. It ultimately rendered its verdict finding Dr. Johnston without fault.

On appeal from the judgment entered upon the jury's verdict, the plaintiffs raise six issues. Two relate to the issue of informed consent: the propriety of the court's refusal to direct a verdict in plaintiffs' favor, and its unwillingness to instruct on the feasibility of autologous transfusion; two evidentiary issues pertain to admissibility of surgery photos and interrogatory answers about remedial measures taken by the physician; and two concern alleged juror misconduct. We shall consider these matters in turn.

I. *Informed Consent.*

■ A. The record contains no dispute over the fact that when Dr. Johnston advised Doe about the risks associated with hip replacement surgery he made no mention of the risk of contracting AIDS from a blood transfusion. Nor did he advise Doe that the risk could be avoided altogether through the use of an autologous transfusion. Thus, the question posed to the trial court—and renewed on appeal—is whether, in February 1985, the risk of contracting AIDS from blood products was so material, and the use of autologous transfusion so reasonable, that the doctor was negligent as a matter of law in failing to so advise his patient. The trial court rejected plaintiffs' suggestion that the evidence com-

pelled a directed verdict in favor of the plaintiffs, and submitted the question to the jury. It is from this decision, and the court's refusal to enter judgment notwithstanding the verdict, that plaintiffs now appeal.

■■■ At the outset we note the familiar rule that only in the "exceptional case" should a district court direct a verdict in favor of either party on a negligence claim. Iowa R.App.P. 14(f)(10). The party opposing the motion is entitled to the benefit of every legitimate inference which may be drawn from the evidence, and if reasonable minds might differ on the issue, a jury question is generated. *Pauscher v. Iowa Methodist Medical Center*, 408 N.W.2d 355, 361 (Iowa 1987); *Rippel v. J.H.M. of Waterloo, Inc.*, 328 N.W.2d 499, 500 (Iowa 1983). Moreover, Doe bore the burden of proving negligence and "[o]nly rarely may a verdict be directed in favor of one who has the burden of proof." *McCaull v. Universal Mfg. Co.*, 218 N.W.2d 592, 593 (Iowa 1974).

Mindful of this standard, Doe argues forcefully that this is the exceptional case. He points to the fact that every physician testifying acknowledged autologous transfusion as the safest form of blood transfusion even prior to 1985, and that it had been a known and available alternative to homologous (anonymous donor) transfusion for many years. And even though defendant's experts testified that it was not a breach of the standard of care to fail to inform of the risk of AIDS or the alternative of autologous transfusion in 1985, each admitted it was a reasonable and responsible practice which several of them included in their preoperative procedures at that time.

■■■ The issue boils down to application of the "patient rule." Under the rule, the patient's right to make an informed decision about submitting to a particular medical procedure places a duty on the doctor to disclose all material risks involved in the procedure. *Pauscher*, 408 N.W.2d at 358; *Cowman v. Hornaday*, 329 N.W.2d 422, 425–26 (Iowa 1983). That duty is shaped, not by what the medical community would deem material, but by the patient's need for information sufficient to make a truly informed and intelligent decision. *Pauscher*, 408 N.W.2d at 359. This is a decision uniquely within the realm of a lay jury. *Id.* at 360.

To prove a breach of this standard, the burden rests with the plaintiff to establish by expert testimony the nature of the risk involved and the likelihood of its occurrence. *Id.* It is then for the jury to decide, "*from the standpoint of the reasonable patient*, whether the risk is in fact a material one." *Id.* (emphasis added).

The record before us reveals agreement among the experts that in 1985 prudence dictated discussion of AIDS in the blood supply because of the publicity about it in both lay and professional journals. There was considerable conflict in the evidence, however, regarding the experts' perception of the actual risk of contracting HIV through donated blood. Dr. Johnston assessed the risk in 1985 at one in 250,000. He thought this too remote a consequence of otherwise beneficial surgery to unnecessarily alarm his patients. His experts, who were all leaders in the field of orthopedic surgery, likewise placed the risk in the range of one in 100,000 to one in a million. By contrast, plaintiffs' experts in epidemiology and pathology assessed the risk much higher and were critical of Dr. Johnston's failure to broach the topic with his patient. Clearly, however, the evidence of materiality was in conflict, and the court properly submitted the issue to the jury.

■■■ The doctor's failure to offer Doe the alternative of an autologous transfusion poses a separate question. As defined in *Cowman* and *Pauscher*, the patient rule does not specifically require the physician to inform the patient of alternative methods of treatment. Because the rule's underlying premise is full disclosure, however, we believe any kind of truly informed consent must be based on knowledge of reasonably available treatment alternatives. Just as with determining whether a risk is "material," the decision about "reasonable availability" is best left for the jury except in the rare case where over-

whelming evidence compels a verdict as a matter of law.

■ Again, plaintiffs contend this is such a rare case. They point to the fact that Dr. Johnston both acknowledged the superiority of autologous transfusion and conceded its use by his surgery patients prior to 1985. The doctor also tendered persuasive evidence, however, that such procedures were rarely used in 1985 and before, principally because of resistance by local blood banks which had no system in place to process such requests for routine surgery. Other orthopedic surgeons reported similar resistance from their own blood banks. This evidence was supported by proof that in 1984, only twenty-two of the 39,517 donations handled by The Des Moines Blood Center were autologous.

Clearly the evidence of reasonable availability was in conflict. When we examine the record in the light most favorable to Dr. Johnston, we find no error in the district court's refusal to direct a verdict for the plaintiffs on the issue of informed consent.

■ B. On a related issue, plaintiffs claim the court erred by failing to give the jury the following instruction: "You are instructed that it was feasible to have done an autologous transfusion to John [Doe] in December 1984 and January 1985." As previously noted, plaintiffs contend the matter of feasibility was established as a matter of law. The district court rejected this argument and properly so.

In *Hutchinson v. Broadlawns Medical Center*, 459 N.W.2d 273, 275 (Iowa 1990), we reiterated the rule that "[i]nstructions should not marshal the evidence or give undue prominence to any particular aspect of a case." The proposed instruction would violate this fundamental rule. "Feasible" is commonly defined as something "capable of being ... dealt with successfully: suitable ... reasonable, likely." Websters Ninth New Collegiate Dictionary 453 (1986). Defendant and his experts conceded at trial that autologous transfusion of blood was *possible* in 1985, but sharply disagreed about the reasonable availability of the procedure. Given this record, we

think it would have been highly improper and probably misleading for the court to instruct as a matter of law on the "feasibility" dispute. Other instructions, not contested on appeal, fully informed the jury about the doctor's duty to his patient. We find no merit in plaintiffs' assignment of error.

II. *Evidentiary Issues.* Plaintiffs challenge two evidentiary rulings on appeal. First, they claim the court committed reversible error when it allowed the jury to view twenty-one surgery photographs in connection with Dr. Johnston's testimony. Second, they argue the court erred by refusing to admit interrogatory answers concerning proof of Dr. Johnston's subsequent advice to patients about AIDS and blood transfusions.

■ A. One of the fighting issues at trial was whether Doe even needed a blood transfusion in connection with the surgery. Plaintiffs offered Dr. Johnston's surgery notes to prove that Doe lost less than an average amount of blood during the operation and appeared to be in no immediate distress when the transfusion of packed red blood cells was ordered. Plaintiffs also tendered one expert's opinion that surgeons regularly transfuse patients unnecessarily, this being a case in point. Dr. Johnston and his experts countered with proof that Doe's hematocrit and hemoglobin levels were declining at the time the blood was ordered, and that a transfusion was medically indicated to avoid a variety of possible complications including shock, hemorrhage, and death from cardiac or respiratory arrest.

Against this backdrop we consider appellant's challenge to twenty-one color slides used by Dr. Johnston to illustrate his description of the surgical procedure. The slides were not actual photographs of the Doe surgery. They had been compiled by Dr. Johnston for use when lecturing medical students about hip replacement surgery.

Plaintiffs characterize the slides as "gruesome." They also contend they were irrelevant and immaterial to any issue in

the case and so prejudicial as to warrant reversal for a new trial. For the reasons that follow we find no merit in these contentions.

It is true that the surgical procedure itself was not the object of plaintiffs' claim of negligence. The extent of blood loss from such surgery, however, was very much a matter of controverted testimony. The slides vividly demonstrated the potential sources of intraoperative and post-operative bleeding occasioned by the surgical incision of large muscles, arteries, veins, bones and tissues.

As for plaintiffs' argument that the slides were prejudicial and inflammatory, we note that the trial court instructed the jurors not to *look* at the slides if the bloody scenes they portrayed made them queasy. The court did, however, admonish the jurors to *listen* to the testimony accompanying them. We think it significant that no objection was raised to the relevance of that testimony. Given the court's instruction, we are convinced that any purely dramatic impact of the slides was minimized.

■ The decision to admit or exclude demonstrative evidence lies in the sound discretion of the trial court. *Schuller v. Hy–Vee Food Stores, Inc.*, 328 N.W.2d 328, 331 (Iowa 1982). We will not reverse such a decision on appeal except upon clear proof that the discretion has been abused. *Twyford v. Weber*, 220 N.W.2d 919, 924 (Iowa 1974). Plaintiffs have not met that burden here.

■ B. During plaintiffs' case in chief, counsel sought to introduce three interrogatories answered by Dr. Johnston prior to trial. The interrogatories asked the doctor when, if ever, he began to inform his patients about the risk of AIDS from blood transfusions and the advisability of autologous donation. Dr. Johnston responded that he first began to do this in early 1986. Over plaintiffs' objection, the district court excluded this evidence under Iowa Rule of Evidence 407. Plaintiffs claim the ruling was erroneous and entitles them to a new trial.

Except with respect to certain legal action not pertinent here, rule 407 provides that:

> [w]hen, *after an event*, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event.

Iowa R. Evid. 407 (emphasis added). The district court concluded that the "event" in question was the blood transfusion ordered for Doe in February 1985. Hence, any measures taken by the doctor to more fully inform his patients after that date would, consistent with the rule, be inadmissible.

Plaintiffs take the contrary view that the operative "event" is the point in time when the doctor becomes aware of the injury. In this case, that knowledge was not obtained until two years after the surgery. Hence, plaintiffs' argument goes, any different advice given patients in the interim was not "remedial" and, thus, was admissible under the rule.

The choice between these two interpretations is not without controversy. The majority rule is that measures taken after a product is manufactured or a service rendered—but before an accident occurs from that product or service—are not "remedial" measures as defined by rule 407. *See, e.g., City of Richmond v. Madison Management Group*, 918 F.2d 438, 459–60 (4th Cir.1990); *Huffman v. Caterpillar Tractor Co.*, 908 F.2d 1470, 1481–82 (10th Cir.1990); *Roberts v. Harnischfeger Corp.*, 901 F.2d 42, 44 n. 1 (5th Cir.1989); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1343 (5th Cir. 1978); *Van Gordon v. Portland Gen. Elec. Co.*, 298 Ore. 497, 503–04, 693 P.2d 1285, 1289–90 (1985). As the Oregon Supreme Court has stated, the concept of "remedial" implies that the "defendant must know of the prior event in order to fashion a safety measure to remedy any hazard that caused the event." *Van Gordon*, 298 Ore. at 504, 693 P.2d at 1289. The measures must "reflect hindsight gained from the ... accident." *Id.* at 505, 693 P.2d at 1290.

At least one jurisdiction has expressed a contrary view. In *Petree v. Victor Fluid Power, Inc.*, 831 F.2d 1191, 1198 (3d Cir. 1987), the court looked to the policy behind the rule, which is to encourage people to take steps to increase public safety. It concluded that the policy would not be served if evidence of defendants' changed behavior could be used to prove liability just because defendant was unaware that any injury or accident had occurred. *Id.* The court reasoned that the policy underlying the rule should apply not only when the safety measures are taken in reaction to an accident, but also when they are taken merely upon discovery that change is needed. *Id.*

We are inclined to think the reasoning of the *Petree* court is more sound, at least insofar as suits for medical malpractice are concerned. The notion of accidents and repairs embodied in the commentary to rule 407 seems to us poorly suited to cases involving medical treatment. Given the ever changing realm of medical technology, we think it unwise to chill a physician's desire to update skills and medical advice for fear that evidence of changed procedure may lead to proof of liability regarding former practice.

Moreover, as the district court noted, such an interpretation is consistent with a plain reading of the rule. By its terms, the rule makes the triggering event the same as the act giving rise to negligence. In this case that would be the 1985 blood transfusion, not the diagnosis of AIDS revealed in 1987.

We hold that the blood transfusion given in 1985 was the event triggering the protection of rule 407, not the doctor's later knowledge of his patient's injury. This is consistent with the district court's ruling. Thus the court made no error when it ruled the doctor's interrogatory answers inadmissible.

III. *Juror Misconduct.* On the fifth day of deliberations, the eight-member jury voted seven to one in favor of Dr. Johnston. Following the trial, the one dissenting juror contacted Doe's counsel and told him that on the last day of deliberations, a juror brought a cartoon to the jury room. The cartoon depicted a judge telling a jury, "The verdict should be guilty or not guilty. There's no provision for guiltyish." In an affidavit filed with the district court the dissenting juror strongly implied that this cartoon influenced the jury to vote in favor of the defendant. Doe moved for a new trial on the ground of juror misconduct.

Upon discovering this development, Dr. Johnston's counsel questioned the remaining seven jurors. All seven signed affidavits stating that the cartoon in no way influenced their decision. Two of the affidavits were attached to defendant's resistance to the motion for new trial. Although the record is not entirely clear, we presume these affidavits were reviewed by the trial court prior to ruling.

On appeal, plaintiffs claim the court erred by (1) considering the resisting affidavits, and (2) denying their motion for new trial based on the prejudicial impact of the cartoon.

■ A. Our rules of evidence specifically allow the district court to consider testimony by a juror regarding "whether extraneous prejudicial information was improperly brought to the jury's attention." Iowa R.Evid. 606(b). To protect the sanctity of the jury room and the deliberative process itself, however, the rule also renders jurors incompetent to testify regarding arguments, votes, and mental reactions occurring during the deliberations. Iowa R.Evid. 606(b); *Schwennen v. Abell*, 471 N.W.2d 880, 888 (Iowa 1991); *State v. Johnson*, 445 N.W.2d 337, 341 (Iowa 1989); *Ryan v. Arneson*, 422 N.W.2d 491, 495 (Iowa 1988). This is essentially the federal rule. *E.g., Tanner v. United States*, 483 U.S. 107, 121, 107 S.Ct. 2739, 2748, 97 L.Ed.2d 90, 106 (1987).

Here, it was appropriate for the court to consider the dissenting juror's proof that extraneous matter had been brought to the jury room. However, to the extent the court relied on the affidavits of individual jurors to assess the cartoon's influence, or lack thereof, such consideration was improper. *Cf. Ryan*, 422 N.W.2d at 495 (trial court correctly disregarded juror affidavits concerning quotient verdict).

B. When there is proof that extraneous material has reached the jury room, the party seeking reversal on a misconduct claim must prove "that the misconduct was calculated to, and with reasonable probability did, influence the verdict." *Johnson,* 445 N.W.2d at 342. The impact of the misconduct is to be judged objectively by the trial court in light of all the allowable inferences brought to bear on the trial as a whole. *See id.* (urging "common sense" evaluation in light of issues, evidence, and witness demeanor); *Urseth v. City of Dayton,* 680 F.Supp. 1084, 1089 (S.D.Ohio 1987) (court's task is to determine whether extraneous information would prejudice an "objective, 'typical juror'").

Plaintiffs urge us to retreat from this standard and adopt, instead, a rule whereby prejudice is presumed to result from the introduction of extraneous material. We decline the invitation to do so. A certain amount of leeway must be built into the system so that a relatively minor incident of misconduct is not allowed to disrupt what may have been a lengthy, costly, and otherwise fair trial. We are still convinced that the trial court is in the best position to objectively assess the impact of juror misconduct.

Applying this objective standard to the present case, we find the court was well within its discretion in denying plaintiffs' motion for new trial. To assume, as plaintiffs suggest, that a mere cartoon would prompt a reasonable juror to reverse his or her view of a case after fifteen days of testimony and four days of deliberation is, we think, unreasonable. The jurors were fully instructed on comparative fault principles. We find it improbable that their understanding of this civil law principle would be warped by a fleeting bit of criminal court humor. Common sense dictates that the impact of the cartoon was insufficient to justify a new trial based on its consideration, if any, by the jury. The district court was correct in so ruling.

AFFIRMED.