# IN THE COURT OF APPEALS OF IOWA

No. 19-0749
Filed October 21, 2020

**STATE OF IOWA,**
　　Plaintiff-Appellee,

**vs.**

**DONCORRION SPATES,**
　　Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Bradley J. Harris (trial) and Thomas A. Bitter (second motion for new trial), Judges.

Doncorrion Spates appeals his convictions for murder, attempted murder, and intimidation with a deadly weapon. **CONDITIONALLY AFFIRMED AND REMANDED.**

Martha J. Lucey, State Appellate Defender, and Robert P. Ranschau, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Richard Bennett, Assistant Attorney General, for appellee.

Considered by Tabor, P.J., and May and Greer, JJ.

**MAY, Judge.**

Doncorrion Spates was convicted of murder in the first degree, attempted murder, and intimidation with a dangerous weapon for his participation in a drive-by shooting. On appeal, Spates argues (1) the jury venire did not represent a fair cross-section of the community; (2) the district court abused its discretion when it denied his motion for new trial based on the weight of the evidence; and (3) the district court erred when it denied a second motion for new trial alleging the jury was not fair and impartial. We conditionally affirm and remand for further proceedings detailed in this opinion.

**I. Background.**

On July 17, 2016, four men left a get-together and travelled to a local store. Jacques Williamson drove his Chevy Tahoe. His passengers were Spates, Shavondes Martin, and Armand Rollins.

After leaving the store, Williamson drove the Tahoe by a Waterloo residence. Some young men were in the front yard. Martin reached over Williamson and shot out of the driver's window. Shots also rang out from the Tahoe's rear driver's-side window. Three men in the yard were hit by bullets. One of them died from his wounds.

The State charged Williamson, Spates, Martin, and Rollins for the shooting. Williamson pled guilty in exchange for a reduction in charges and his truthful testimony against Spates, Martin, and Rollins. The State tried Spates, Martin, and Rollins together. The jury acquitted Martin and Rollins. But it convicted Spates. He appeals.

## II. Analysis.

## A.    Fair Cross Section

We begin with Spates's claim that the jury venire did not represent a fair cross-section of the community.  Because Spates's claim is rooted in the state and federal constitutions, our review is de novo.  *State v. Plain*, 898 N.W.2d 801, 810 (Iowa 2017).  To obtain relief, Spates must establish three elements:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*State v. Lilly*, 930 N.W.2d 293, 299 (Iowa 2019) (quoting *Plain*, 898 N.W.2d at 822).

As for the first element, Spates alleges African-Americans were excluded from the jury pool.  The State concedes that African-Americans are a "distinctive" group for purposes of this analysis.  So Spates established the first element.

With respect to the second element, the district court found representation of African-Americans in the jury venire could not be reliably determined.  This is because a large portion of prospective jurors declined to self-identify their race on the jury questionnaire.  But we need not explore the second element further because, as will be explained, Spates cannot satisfy the third element.

The third element requires Spates to show that the purported "underrepresentation is due to *systematic* exclusion of the group in the jury-selection process."  *Id.* (emphasis added) (citation omitted).  "[S]tatistically significant disparities alone are not enough.  Rather, [Spates] must tie the disparity to a particular practice."  *See id.* at 307.

Here, the jury venire was selected from voter-registration data and Iowa Department of Transportation (DOT) data. Spates suggests a more diverse pool could be drawn if additional sources of data were utilized. That does not seem like an unreasonable proposition. But Spates fails to demonstrate that drawing individuals just from DOT and voter-registration data results in "*systematic* exclusion" of African-Americans. *See id.* at 299 (emphasis added). Instead, he relies on the purported underrepresentation in itself. But, as the State points out, this alone is not sufficient to establish a causal connection. *See id.* at 305–06. Rather, Spates "must show evidence of a statistical disparity over time that is *attributable to the system for compiling jury pools*." *Plain*, 898 N.W.2d at 824 (emphasis added). Spates has not done so. He does not connect the system to the purported disparity. So his challenge fails on the third element.

As a fallback position, Spates suggests remand is appropriate in light of the supreme court's decisions in *Lilly*, 930 N.W.2d 293, *State v. Veal*, 930 N.W.2d 319 (Iowa 2019), and *State v. Williams*, 929 N.W.2d 621 (Iowa 2019). But Spates does not explain what difference *Lilly*, *Veal*, or *Williams* could make to his case. He claims we should remand "to give" him "an opportunity to develop a record" in light of those decisions. But he does not explain—even in general terms—*how* he would develop the record differently as to any of the three *Plain* elements. And so he does not explain how a different record might support a different outcome.

Because Spates has not explained how remand could help his case, we cannot conclude remand is necessary.

**B.** **Weight of the Evidence**

Spates also challenges the district court's denial of his motion for new trial based on the weight of the evidence.  Our review is "for an abuse of discretion." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016).  "'A district court abuses its discretion when it exercises its discretion on grounds clearly untenable or to an extent clearly unreasonable[,]' which occurs when the district court decision 'is not supported by substantial evidence or when it is based on an erroneous application of the law.'"  *State v. Wickes*, 910 N.W.2d 554, 564 (Iowa 2018) (alteration in original) (citation omitted).

"Under Iowa Rule of Criminal Procedure 2.24(2)(b)(6), [the] district court may grant a new trial '[w]hen the verdict is contrary to law or evidence.'"  *Id.* at 570. "A verdict is contrary to the weight of the evidence only when a greater amount of credible evidence supports one side of an issue or cause than the other."  *Id.* (internal quotation marks omitted) (quoting *Ary*, 877 N.W.2d at 706).  "The district court reaches this determination by applying the weight-of-the-evidence standard, which requires the district court to decide 'whether "a greater amount of credible evidence" suggests the verdict rendered was a miscarriage of justice.'"[1]  *Id.* (quoting *Ary*, 877 N.W.2d at 706).  As Spates recognizes, "[g]iven this exacting standard, a district court should only grant a motion for new trial 'in the extraordinary case in which the evidence preponderates heavily against the verdict rendered.'"  *Quoting Ary*, 877 N.W.2d at 706.

---

[1] Spates does not challenge whether the district court applied the weight-of-the-evidence standard.

Spates argues his case warrants a new trial because much of the incriminating evidence against him came from the driver of the Tahoe, Williamson. Williamson's trial testimony varied some from prior depositions. Williamson also admitted he previously lied to investigators. And Spates keys in on Williamson's statements about Spates's exact location in the backseat of the Tahoe. At one point, Williams stated Spates was in the rear passenger-side seat; he later stated Spates moved to the rear driver-side seat, one of the windows from which the shooting occurred.[2] Given these weaknesses, Spates contends Williamson's testimony should be treated as a nullity. *See State v. Smith*, 508 N.W. 2d 101, 103 (Iowa Ct. App. 1993) (noting "testimony of a witness may be so impossible and absurd and self-contradictory that it should be deemed a nullity by the court" (citation omitted)).

We disagree. True, Williamson's testimony was not totally consistent with his prior statements. But it was not so contradictory as to render his testimony absurd or impossible. *Cf. State v. Lopez*, 633 N.W.2d 774, 785 (Iowa 2001).

Spates also notes a witness testified she saw a black sleeve out of the back window of the vehicle. And Spates wore a white T-shirt the night of the shooting. But we do not find these facts particularly compelling. The witness did not specifically testify that the person with the black sleeve fired a gun. Instead, she testified she saw an arm covered in a black sleeve extended out of the vehicle

---

[2] The State admitted surveillance video at trial, that Spates now relies upon, presumably showing Spates getting into the rear passenger seat when the men left the store. But on appeal, we cannot play the footage due to apparent damage to the flash drive. However, we note Spates's contention that the footage showed him get into the rear passenger seat is consistent with Williamson's testimony that Spates initially sat in the rear passenger seat.

window and then saw a flash.  In fact, she specifically testified she did not see a gun.  And it stands to reason that if the shooter was the person with the black sleeve, then the witness might well have seen a gun in the person's hand as their arm fully extended out the window as described by the witness.  This leaves open the reasonable inference that Spates, in his white T-shirt—and one of only two people in the back seat—was the shooter instead.

Moreover, during their investigation, police recovered casings in two different calibers.  This suggests two different guns were fired.  It is not a leap to conclude there were two shooters—one in front and one in back of the Tahoe.  This reasonable conclusion is consistent with Williamson's testimony and further implicates Spates as a shooter.

Additionally, we note that, before the group left for the liquor store that evening, Spates briefly got into the backseat of the vehicle.  One could infer he placed a weapon in the vehicle with the intention of using it later.

On this record, we cannot conclude the district court abused its discretion in denying the motion for new trial.

C.      **Impartial Jury**

Finally, Spates claims the district court erred in denying his second motion for new trial because he did not receive a fair and impartial trial.

Spates's motion claimed racial animus impacted jury deliberations.  Spates is African-American—and his motion alleged jurors made derogatory statements about African-Americans during the deliberation process.  In light of *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 861 (2017), the district court responded by

permitting the parties to question jurors. All twelve jurors testified.[3] Some jurors testified to hearing remarks related to race—but no juror testified that race impacted the verdict. The district court denied Spates's motion for new trial. Spates moved for an expanded ruling explicitly addressing the issue under the Iowa Constitution. The court denied that motion as well.

On appeal, Spates argues he was entitled to a new trial under the federal constitution as interpreted in *Pena-Rodriguez* and its progeny or, alternatively, under "an independent approach under Article 1, section 10 of the Iowa Constitution." The State doubts the district court should have even permitted questioning of the jurors regarding their internal discussions. In any event, the State believes the record supports the district court's denial of Spates's request for a new trial.

We begin our analysis by acknowledging the importance of jurors in our system of justice. We entrust jurors with enormous responsibility—and justifiably so. We believe our jurors are "intelligent and impartial." *Fowle v. Parsons*, 141 N.W. 1049, 1050 (Iowa 1913) (citation omitted). They carry "the common knowledge and experience" of our citizenry. *Id.* (quoting *Moore v. Chicago, R.I. & P. Ry. Co.*, 131 N.W. 30, 32 (Iowa 1911)). And although, "[l]ike all human institutions, the jury system has its flaws, . . . experience shows that fair and impartial verdicts can be reached if the jury follows the court's instructions and undertakes deliberations that are honest, candid, robust, and based on common sense." *Pena-Rodriguez*, 137 S. Ct. at 861.

---

[3] The trial judge and judicial assistant also testified. A different judge heard and decided Spates's motions relating to racial statements by jurors.

So "[a] general rule has evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations." *Id.* "This principle, itself centuries old, is often referred to as the no-impeachment rule." *Id.* In Iowa, the "no-impeachment rule" is codified in Iowa Rule of Evidence 5.606(b). It generally protects jurors from being called to testify about "any statement made or incident that occurred during the jury's deliberations; the effect of anything upon that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Iowa R. Evid. 5.606(b)(1); *see Doe v. Johnston*, 476 N.W.2d 28, 34 (Iowa 1991) ("To protect the sanctity of the jury room and the deliberative process itself, however, the rule also renders jurors incompetent to testify regarding arguments, votes, and mental reactions occurring during the deliberations.").[4]

But, like all of our laws, rule 5.606(b) is subject to the constitutions of the United States and Iowa. *See* U.S. Const. art. VI, cl. 2. ("This Constitution . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); Iowa Const. art. XII, § 1 ("This constitution shall be the supreme law of the state, and any law inconsistent therewith, shall be void."). If rule 5.606(b)

---

[4] Rule 5.606(b)(2) does contain some narrow exceptions. It says, "[a] juror may testify about whether: (A) Extraneous prejudicial information was improperly brought to the jury's attention. (B) An outside influence was improperly brought to bear on any juror. (C) A mistake was made in entering the verdict on the verdict form."

Neither Spates nor the State suggests that any of these codified exceptions apply here.

conflicts with the state or federal constitutions, the rule must yield. *See Goodwin v. Iowa Dist. Ct.*, 936 N.W.2d 634, 649 (Iowa 2019) (McDonald, J., specially concurring) (noting "the Iowa Constitution provides any law—without regard to its source—inconsistent therewith 'shall be void'" (quoting Iowa Const. art. XII, § 1)).

And, indeed, both constitutions expressly regulate the conduct of criminal prosecutions. A key example is the right to trial by an impartial jury. It is protected by both the Sixth Amendment to the United States Constitution[5] and Article I, section 10 of the Iowa Constitution.[6] Here are their texts:

| Sixth Amendment of the United States Constitution | Article 1, section 10 of the Iowa Constitution |
|---|---|
| In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense. | In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right to a speedy and public trial *by an impartial jury*; to be informed of the accusation against him, to have a copy of the same when demanded; to be confronted with the witnesses against him; to have compulsory process for his witnesses; and, to have the assistance of counsel. |
| (Emphasis added.) | (Emphasis added.) |

In *Pena-Rodrguez*, the Supreme Court considered whether the Sixth Amendment requires a constitutional exception to no-impeachment rules—like our

---

[5] The Sixth Amendment applies to the states through the Fourteenth Amendment. *State v. Biddle*, 652 N.W.2d 191, 200 (Iowa 2002).

[6] Article I, section 9 of the Iowa Constitution also assures the right to trial by jury. ("The right of trial by jury shall remain inviolate; but the general assembly may authorize trial by a jury of a less number than twelve men in inferior courts; but no person shall be deprived of life, liberty, or property, without due process of law.")

rule 5.606(b)—"when, after the jury is discharged, a juror comes forward with compelling evidence that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict." 137 S. Ct. at 861. The Court answered in the affirmative. *Id.* at 869. The Court explained:

> that where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.

*Id.*

Significantly, though, the *Pena-Rodriguez* Court did not explain "what procedures a trial court must follow when confronted with a motion for a new trial based on juror testimony of racial bias." *Id.* at 870. Nor did the *Pena-Rodriguez* Court "decide the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a new trial be granted." *Id.* The Court left these issues open for development by the lower courts. As far we can tell, no Iowa appellate court has previously addressed either issue.

And so this case calls on us to plow some fairly new ground. In doing so, we rely heavily on the words of *Pena-Rodriguez* itself. We find useful guidance in this excerpt:

> Not every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial

court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence.

*Id.* at 869.

We have also considered our courts' traditional vigilance in protecting the right to trial by an impartial jury. Indeed, we believe "[t]he right to a trial by an impartial jury lies at the very heart of due process." *State v. Christensen*, 929 N.W.2d 646, 669 (Iowa 2019) (alteration in original) (quoting *Smith v. Phillips*, 455 U.S. 209, 224 (1982) (Marshall, J., dissenting)); *see also Dixon v. State*, No. 16-2195, 2018 WL 3471833, at *6 (Iowa Ct. App. July 18, 2018) (citation omitted). "To protect the defendant's right to trial by a fair and impartial jury, we have in place an elaborate pretrial process to select and empanel a fair and impartial jury." *Dixon*, 2018 WL 3471833, at *6. But "[w]hen these processes fail and *a* biased juror is seated on the case, the defendant's right to trial by an impartial jury is compromised." *Id.* (emphasis added). To repeat: if even *a single* biased juror is seated, the process has failed. *Id.* "This failure directly affects the defendant's interest in having a fair determination of guilt." *Id.* (citing *Patton v. United States*, 281 U.S. 276, 292 (1930) ("A constitutional jury means twelve [persons] as though that number had been specifically named; and it follows that, when reduced to eleven, it ceases to be such a jury quite as effectively as though the number had been reduced to a single person."), *abrogated by Williams v. Florida*, 399 U.S. 78, 91–92 (1970)). "This failure also undermines the public's confidence in the integrity of our trial processes." *Id.*

With these principles in mind, we turn to the practical question that faced the district court, namely, how the court should respond to a motion for new trial

based on evidence of race-related statements by jurors. Like the district court, we think the process should have two parts.

First, the court must decide whether—notwithstanding rule 5.606(b)—*Pena-Rodriguez* requires the court to hear juror testimony about alleged race-related statements. As in the case at bar, we anticipate this determination will depend primarily on affidavits presented by the defendant. The question for the court to decide is whether defendant has presented "compelling evidence" that—if believed—would establish that a "juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict." *Pena-Rodriguez*, 137 S. Ct. at 861. In making this evaluation, the court should consider both the content and the context of the alleged statements. *Id.* at 869 (noting the determination depends on "all the circumstances, including the content and timing of the alleged statements").

If the defendant fails to meet this threshold standard, the inquiry ends. But if the defendant meets this standard, then the court should next consider whether a new trial is appropriate.

At this second stage, we anticipate that—as in the case at bar—the district court will conduct an evidentiary hearing at which the defendant and the State may present live testimony from jurors and, if appropriate, other witnesses. Ultimately, the court should make findings of fact—including, whenever appropriate, express credibility determinations—as to (1) whether defendant has proven by "compelling evidence" that—*in fact*—a "juror made clear and explicit statements" relating to race; and (2) if so, the specific content and context of the statements, including both the particular words spoken and any relevant contextual details. Then, based

on the content and context of the statements—including the larger context of the evidence and issues in the trial—the court should determine whether defendant has proved by "compelling evidence" that, in fact, a "juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict." *See id.* If so, the court should grant a new trial.

We emphasize that both determinations—whether to receive juror testimony and whether to grant a new trial—should be based on *objective* circumstances, e.g., what was said; how and when it was said; what was said and done before and after; whether and how the statements relate to evidence in the case; whether and how the statements relate to the issues the jury will decide when reaching a verdict. Conversely, neither determination should depend on the jurors' *subjective* evaluations of their own motives—or the motives of other jurors—in voting to convict. On this issue, we follow the example of cases involving the improper introduction of extraneous information, another narrow area in which courts are permitted to consider juror testimony. *See* Iowa R. Evid. 5.606(b)(2)(A). Those cases hold that, although it is proper for the district court to consider jurors' testimony about the introduction of extraneous matter, it is not proper for the court to rely on *jurors' assessments* of the "influence, or lack thereof" of the extraneous matter on their verdict. *See, e.g.*, *Doe v. Johnston*, 476 N.W.2d 28, 34 (Iowa 1991). For example, in *Do*e, there was evidence a juror improperly brought a cartoon into the jury room. *Id.* Our supreme court held it was appropriate to consider the introduction of the cartoon and its relationship—or lack thereof—to the issues at trial. *Id.* But the district court should not have considered juror "affidavits stating that the cartoon in no way influenced their decision." *See id.* This is because the

"[t]he impact of the misconduct is to be judged *objectively* by the trial court in light of all the allowable inferences brought to bear on the trial as a whole."  *Id.* at 35 (emphasis added).  "[N]either the [c]ourt nor counsel may inquire into *the subjective effect* of these external influences upon particular jurors.  Rather, the court must determine whether such extraneous information was prejudicial by determining how it would [a]ffect *an objective 'typical juror.'*"  *Urseth v. City of Dayton*, 680 F. Supp. 1084, 1089 (S.D. Ohio 1987) (emphasis added); *see also Christensen*, 929 N.W.2d at 679 ("We also note that our prior cases adopt the view that juror statements about *the impact of* the improperly introduced influence are not admissible on the question of prejudice.  What can be considered is *objective facts*—who said what to whom and when and what specifically was injected into the jury discussion.  *But juror assessments about the impact* of the improper extraneous influence *are off limits*." (emphasis added) (internal citation omitted)).

Similarly, when deciding whether to grant a new trial on the basis of a juror's race-related statements, the relevant inquiry is not whether jurors *subjectively* believe racial animus impacted their own vote or anyone else's.  Instead, the relevant inquiries are (1) what was the content and context of the race-related statements; and (2) viewed objectively, do those statements establish that the speaker's "racial animus was a significant motivating factor in his or her vote to convict."  *See Pena-Rodriguez*, 137 S. Ct. at 861.  And again we emphasize that— if even one juror voted to convict because of race—a new trial is required.  *See Christensen*, 929 N.W.2d at 681 ("A jury consisting of even one biased juror is constitutionally infirm.").

But we also emphasize that, as Justice Appel has noted, *Pena-Rodriguez* offers a "very narrowly crafted" remedy that applies only in "the worst of cases." *State v. Veal*, 930 N.W.2d 319, 345 (Iowa 2019) (Appel, J., dissenting in part and concurring in part). And as the Court said in *Pena-Rodriguez*, "[n]ot every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry." 137 S. Ct. at 869. Likewise, not every statement suggesting "racial bias or hostility" will require a new trial under the standard we describe here—which, of course, closely parallels the *Pena-Rodriguez* standard for permitting jurors to testify. *See id.* Rather, at both stages, a race-related comment will only "qualify" if it "tend[s] to show that racial animus was a significant motivating factor in the juror's vote to convict."[7] *See id*

With these principles in mind, we turn to Spates's claim. It requires us to consider two questions. First, did the district court abuse its discretion by permitting Spates to present juror testimony about race-related statements? *Id.* ("Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence."). Second, did the district court abuse its discretion by denying Spates's motion for new trial? *See State v. Webster*, 865 N.W.2d 223, 231 (Iowa 2015)

---

[7] We decline Spates's invitation to hold that Article I, section 10 of the Iowa Constitution requires a per se standard under which any "racist statement" by a juror is enough—in itself—to automatically "establish[] that the juror relied upon racial bias or animus in reaching a verdict." As explained, we believe the Sixth Amendment as interpreted in *Pena-Rodriguez* suggests a much more nuanced approach that considers the exact content of juror statements, their context, and their relationship—if any—to the issues the jury must decide. The briefs give us no reason to conclude the Iowa Constitution requires a different approach.

(holding our standard of review for "a denial of a motion for a new trial based upon . . . juror bias [is] for an abuse of discretion"); *see also Christensen*, 929 N.W.2d at 682 (Waterman, J., specially concurring) (noting "[w]e have long held that rulings on motions for new trial or mistrial based on juror misconduct or bias are reviewed for an abuse of discretion" and collecting cases).

We address each question in turn.

**1. Decision to hear juror testimony.**

The present issues arose when, in July 2018, Spates's counsel filed his second motion for new trial. It alleged that Spates's counsel had "recently spoken with a juror" who advised "that two fellow jurors made comments during deliberations which that juror deemed to be racist." And the motion cited *Pena-Rodriguez.*

Spates also sought permission to subpoena jurors as witnesses for a hearing on his claim. In support, Spates's counsel signed and filed an affidavit. It reported counsel's recollection of a personal conversation with a juror. According to the affidavit, the juror heard two other jurors—one male and the other female— say "derogatory things about black people" during deliberations. It also provided details, including these:

> f. While deliberating over why the defendants left a shell casing left in the vehicle, the male juror stated that they're "all" in gangs and if you do drive by shootings "all the time" you're just used to it, and that was why the defendants overlooked disposing of the casing.
>
> g. During deliberations, the female juror stated that the way black people are raised, "it's o.k. to kill people".

In a thorough, detailed ruling, the district court granted Spates's request for juror testimony. The court reasoned:

> Here, the defendant is African-American, and the allegation is that a juror or jurors said derogatory things about African-American people during deliberations. The specific comments are included in the defendant's filings. *Those comments, if made, tend to show that race played a substantial factor in the deliberation process and in the verdict reached by the jury.* Pursuant to the U.S. Supreme Court's holding in *Pena*, this court is compelled to consider the evidence of the juror's statement and any resulting denial of the defendant's jury trial guarantees. Hearing will be held, and the defendant will be permitted to offer testimony from the juror(s) in question.

(Emphasis added.)

We see no abuse of discretion in this ruling. While the court could have chosen to demand other evidence—such as an affidavit signed by a juror rather than the second-hand recollections of an attorney—the court had discretion to accept counsel's representations. Moreover, the statements detailed in the affidavit drew a direct connection between race-based assumptions and verdict-determining facts, namely, "drive by shootings" and "kill[ing] people." And so, like the district court, we think the statements detailed in the affidavit—"if made"—could very well show that racial animus played a substantial role in one or more jurors' decisions to convict. So we agree the court was "compelled to consider the evidence of the juror's statement[s] and any resulting denial of the defendant's jury trial guarantees." The court was right to hold a hearing and receive juror testimony.

**2. Denial of new trial.**

In another thorough, detailed ruling, the district court concluded the motion for new trial should be denied. As will be explained, we remand to make additional findings and conclusions in a new ruling on the motion for new trial. But we

emphasize that our disposition of this matter should not be read as a criticism of the district court, which did not have this opinion as guidance. On the contrary, we applaud the district court's thoughtful rulings on the novel issues presented by *Pena-Rodriguez* and the facts of this case.

Still, we conclude the district court's approach differed from the approach we have outlined here. Most significantly, in denying Spates's motion for new trial, the district court relied in part on the jurors' *subjective evaluations* of their own motives. The court noted "[e]very juror confirmed that his/her verdict was unaffected by the defendant's race." As explained, however, we do not believe subjective considerations of this kind should be a part of the analysis. *Cf. Doe*, 476 N.W.2d at 34–35 (holding that district court should not have considered juror affidavits stating that the cartoon in no way influenced their decision in extraneous evidence case).

So we remand for the district court to rule again on the motion for new trial in light of this opinion and the current record. The court's determinations on remand should include:

(1) whether the defendant has proved by "compelling evidence" that a "juror made clear and explicit statements" relating to race;

(2) if so, the specific content of the statements;

(3) all relevant context for the statements; and,

(4) ultimately, whether defendant has proven by "compelling evidence" that a "juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict." As explained, this is an objective determination based on

the content and context of the statements, including the evidence and issues in the trial.

If the district court answers this last question in the affirmative, a new trial should be granted. Otherwise, the conviction and sentence will stand.

### III. Conclusion.

Spates's challenge to the jury venire fails because he has not established any underrepresentation of a distinctive group in the jury venire was the result of systematic exclusion. The district court did not abuse its discretion when it denied Spates's motion for new trial based on the weight of the evidence. And we remand to the district court to make additional findings as to Spates's second motion for new trial.

**CONDITIONALLY AFFIRMED AND REMANDED.**